**JUDGE RAMOS**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 13 CIV 5032

VICTOR RESTIS, ENTERPRISES SHIPPING
AND TRADING S.A., and FIRST BUSINESS
BANK S.A

        Plaintiffs,

      - v. -

AMERICAN COALITION AGAINST
NUCLEAR IRAN, INC. a/k/a UNITED
AGAINST NUCLEAR IRAN, MARK D.
WALLACE, DAVID IBSEN, NATHAN
CARLETON, and DOES 1-10,

        Defendants.

Case No. _____(___)(___)

**COMPLAINT FOR DEFAMATION AND
OTHER TORT CLAIMS**

**JURY TRIAL DEMANDED**

RECEIVED
JUL 19 2013
U.S.D.C. S.D. N.Y.
CASHIERS

1.     This is an action for defamation and other tort claims brought by Victor

Restis, a Greek citizen, entrepreneur and highly respected businessman in the international

shipping industry.  Mr. Restis manages Enterprises Shipping and Trading, S.A. ("EST"), the

flagship of the Restis family shipping businesses, and he formerly served as the CEO of First

Business Bank, S.A. ("FBB"), a private Greek bank in which he was a shareholder.

2.     Since his father passed away in 2004, Mr. Restis has shouldered sole

responsibility for the success or failure of the Restis family businesses, and he has carried on the

family's deep commitment to promote the welfare of others through charitable and humanitarian

support.  As a result of his leadership, dedication to excellence, adherence to sound ethical

principles, and years of hard work, Mr. Restis has transformed the family's mid-sized shipping

company into one of the largest international shipping businesses in the industry, and he employs

nearly 3,000 sailors and about 200 office staff personnel.  As a result of his business acumen,

professionalism, integrity and philanthropic endeavors, Mr. Restis has earned the esteem and

respect of governments and other authorities, academic institutions, existing and potential business clients, as well as employees and citizens in Greece, the United States and around the world.

3.      This action is brought against United Against Nuclear Iran ("UANI"), a non-governmental organization, and Mark D. Wallace, UANI CEO and a former representative of the Management and Reform Section of the U.S. Mission to the United Nations.[1]  While Mr. Wallace has been featured in media broadcasts and press reports saying and suggesting that he was the United States Ambassador to the United Nations, this is not the case.  In fact, Mr. Wallace has never held the post of The United States Ambassador to the United Nations. Additional defendants include David Ibsen, UANI's Executive Director, Nathan Carleton, UANI's Communications Director, and other as yet unknown defendants.  UANI describes itself as a "not-for-profit, non-partisan, advocacy group that seeks to prevent Iran from fulfilling its ambition to obtain nuclear weapons."

4.      In pursuit of its objective, UANI conducts what it describes as "private sanctions campaigns" to end "the economic and financial support of the Iranian regime by corporations, firms, entities and individuals."  UANI conducts "name and shame" campaigns against companies and individuals it claims are facilitating a nuclear Iran, that are designed to inflict devastating and irreparable reputational damage that will "shame" U.S. and international companies to acquiesce to UANI's demands and agenda.  UANI's "name and shame" reputation destruction tactics include, among other things, highly inflammatory and derogatory press releases; letters to government authorities, officials and representatives calling for investigations and punitive measures; billboards designed to smear, vilify, harass and otherwise degrade the

---

[1] The U.S. Mission's Management and Reform Section serves as the U.S. delegate to the General Assembly's Fifth Committee and other committees that have responsibility for administrative and budgetary matters.

targeted company; calls for action; calls for boycotts; and abusive and threatening website and Facebook postings, tweets, and other forms of mass communication. All of these are carefully crafted and intended to inflict reputational and economic injury so severe and irreparable that the targeted company will acquiesce to UANI's demands.

5.    While it has no legal authority to do so, UANI's reputation destruction campaign tactics include demanding that the targeted company or individual sign a sworn statement under the penalty of perjury refuting whatever charges UANI has made; submit to an examination of the business UANI has targeted by an auditor on its referral list; and subject itself to an audit and review by an "independent" counsel. If the targeted company does not agree to these and other demands, Defendant Wallace assures the company that "UANI will pursue all options at its disposal," including seeking to "black list" the company, and turning over the company and materials in UANI's possession to law enforcement authorities and U.S. lawmakers. In this regard, UANI not only acts as judge, jury and executioner, it poses as interrogator and police.

6.    Through its "name and shame" campaigns and arsenal of reputation destruction tactics, UANI fires away to kill existing and potential client and customer relationships, and pressure consumers and citizens to boycott the targeted company or its product. In an October 2012 NBC press report posted on its website, UANI's Communications Director Nathan Carleton unequivocally confirmed that UANI's shaming campaigns "are meant not only to punish the business, but to alert the consumer as well." Thus, UANI seeks to use the crushing weight and devastating consequences of its reputation destruction campaigns to force the targeted company to comply with UANI's demands, so it can then publicly claim victory and "applaud" the company for "collaborating" with UANI.

7.     This action arose on May 13, 2013, when Defendants launched their highly inflammatory, derogatory, worldwide, multi-media, "name and shame" campaign against Mr. Restis, EST and FBB.  To kick-off this reputation destruction campaign, UANI posted on its website a letter from Mr. Wallace to Mr. Restis, in which Mr. Wallace made numerous shocking, outrageous, malicious, false and defamatory *per se* accusations, including, as examples, false accusations that Mr. Restis, and the Restis family businesses, EST and FBB, are *"front-men"* engaged in *"illicit," "unethical,"* and *"indeed illegal"* business *"schemes"* with the Iranian Regime, and *"put simply"* are *"providing extensive and critical shipping and financial services to the Iranian regime and facilitating the expansion of its oil industry, in flagrant contravention of the international sanctions regime . . . and in exchange for an enormous investment from the Iranian regime."*

8.     Acting as self-appointed judge, jury and executioner – without ever contacting Mr. Restis to discuss any concerns, ask any questions or confirm the accuracy or inaccuracy of the grave, inflammatory and extremely damaging accusations it intended to widely publish – UANI aggressively launched its campaign vilifying Mr. Restis as a despicable criminal in league with the Iranian regime, by simultaneously sending copies of Mr. Wallace's May 13, 2013 letter to government officials and authorities in the United States, Greece and other countries.  To garner maximum press attention to its ambush assassination of Mr. Restis' character and respected reputation in the international shipping industry, UANI also issued a May 13, 2013 press release through Business Wire, a company that distributes news releases worldwide to news media, financial markets, investors, web sites, databases and other audiences, and has carriage agreements with major news agencies, including the Associated Press, Bloomberg, Dow-Jones, Reuters, Thomson One, and some 60 regional news agencies.

9.     Defendants' highly inflammatory, extremely damaging, false and defamatory *per se* publications claiming that Mr. Restis and his companies are criminals and "front-men" for the Iranian regime are absolutely false.  There is no factual basis for Defendants repeated accusations.  As Defendants are well aware, and Mr. Wallace has admitted, Mr. Restis and the Restis family companies, FBB and EST, in fact, are not engaged in illegal business schemes with Iran.  They do not currently have, nor have they ever had, any illicit business arrangement, transaction, or scheme of any kind with the Iranian Ministry of Petroleum, the National Iranian Oil Company, the National Iranian Tanker Company, or any other sanctioned person or entity.

10.     With malicious intent and in reckless disregard for the truth and facts, Defendants have misled, misinformed and alarmed the public, the media, government authorities, and existing and potential business associates in Greece, the United States and around the world, to wrongly believe that Mr. Restis is personally and politically aligned with the Iranian regime, and by direct implication, its avowed commitment to annihilate Israel and the Jewish people.  Nothing could be further from the truth or more personally offensive, abhorrent and irreparably devastating to Mr. Restis and his family.

11.     In fact, Mr. Restis is a Jewish person, whose grandparents are originally from the island of Rhodes.  It is a horrifying fact of history that nearly 95% of the Jewish community in Rhodes was exterminated during the Holocaust.  When the German Army occupied Rhodes during World War II, Mr. Restis' maternal grandparents and other relatives were deported from Rhodes and exterminated at the Auschwitz camp in Poland.  Mr. Restis' mother serves as President of the Jewish Community of Rhodes and has created a museum, facilitated restoration of the cemetery, and sponsored a memorial to honor, and never forget, the

victims of the Holocaust, including her own mother and father.  In stark contrast to Defendants' heinous accusations that Mr. Restis is a "front-man" who is facilitating a nuclear Iran – the most dire enemy of Israel and the Jewish people – the Restis family is deeply and demonstrably committed to the security of Israel and the Jewish people.

12.    Defendants false accusations are based on two fraudulent and facially unreliable documents:  (1) a purported letter from Dimitris Cambis, a representative of Iranian interests in Greece, in which he supposedly proposed to Mr. Restis a meeting with Iranian officials supposedly in Greece, and (2) a purported "consultancy engagement agreement letter." Not surprisingly, Defendants have not posted either of these documents on their website or otherwise made them publicly available for examination and scrutiny, for the simple reason that the documents do not confirm Defendants' false accusations that Mr. Restis is a "front-man" engaged in illegal business schemes with the Iranian regime.

13.    The first document mischaracterized by UANI as "confirmation" of its false accusations is patently fraudulent for multiple reasons.  This includes the fact that it is written in English and not in Greek; it is on letterhead with a watermark that has not been used by the entity it purportedly came from for a number of years; a records search shows that Iranian officials never visited Greece when the letter said they did; and the purported author, Mr. Cambis, has confirmed under oath that he neither wrote nor signed the fraudulent letter.

14.    The second document mischaracterized by UANI as "confirmation" of its false accusations consists of some type-written and unfinished pages, without letterhead or signatures, written in English and not Greek, and it refers to a non-existent company.  From May 13, 2013 to the present, UANI has posted and disseminated multiple publications, including its false and defamatory letters, press releases, website and Facebook posts and tweets, repeating,

perpetuating and exacerbating its false and extremely serious accusations of criminal conduct. However, Defendants still have not posted the two bogus documents on which UANI's "name and shame" reputation destruction campaign against Mr. Restis is wrongly based.

15.    Within three days after Defendants launched their false reputation destruction campaign, in the midst of the extreme shock, turmoil, and 24/7 task of triaging and mitigating the overwhelming and devastating harm immediately inflicted upon Mr. Restis personally, financially and in his daily business affairs around the world, on May 17, 2013, counsel for Mr. Restis provided written notice to Mr. Wallace and UANI that, contrary to their accusations, "Mr. Restis does not do business with Iran nor does he sanction others who do" and "the public transmission of these false statements is libel *per se*." Further, counsel informed Defendants that "the basis of your allegations are false and fraudulent and were either given to you by persons seeking to harm Mr. Restis in his business or were wrongfully used by you to harm Mr. Restis." Despite this prompt notice, Defendants continued and even expanded the scope and content of their campaign, willfully and maliciously exacerbating the egregious damages and irreparable harm to Mr. Restis and the Restis family businesses.

16.    Since May 13, 2013, Defendants have published and globally disseminated at least 15 separate publications, and with carefully crafted content, words, graphics, images, captions and headlines, repeatedly and continuously communicating to prominent government officials, the media, existing and potential business associates, and public worldwide, the false, inflammatory and defamatory *per se* message that Mr. Restis and the Restis family businesses are "front-men" engaged in "illicit," "unethical," and "indeed illegal" business "schemes" with the Iranian regime in violation of international sanctions. The images, graphics,

headlines and content of Defendants' publications defaming and disparaging Mr. Restis and the Restis family businesses drip with malice.

17.    UANI launched is reputation destruction campaign against Mr. Restis – and continues to perpetuate it – with knowledge of falsity and in reckless disregard for the falsity of its grave and inflammatory accusations.  While Mr. Restis respects Defendants' rights to lawfully advocate for a nuclear free Iran, under well-established First Amendment law, carefully balancing the public interest in robust discussion and debate with the rights of individuals not to be subjected to falsehoods that impugn their character and reputation, Defendants' mission, however admirable, may not lawfully and responsibly be achieved by trampling over the rights of others, including Mr. Restis and the Restis family businesses.  As UANI and Mr. Wallace, an educated lawyer well acquainted with the media arena, are aware, the United States Supreme Court made clear in the seminal libel case, *Gertz v. Robert Welch, Inc.*, that "[t]here is no constitutional value in false statements of fact," because "[n]either the intentional lie nor the careless error materially advances society's interest" in discussion and debate on public issues. With respect to UANI's "name and shame" reputation destruction campaign against Mr. Restis and the Restis family – fueled by self-righteous impunity – Defendants have maliciously trampled over the rights of Mr. Restis and his family, egregiously misused and abused their voice, and irresponsibly betrayed the public trust.

18.    As intended, Defendants' unmitigated and ongoing demonstrably false and malicious campaign dubbing Mr. Restis a criminal in league with the Iranian Regime has wrongly cast an unwarranted dark cloud of suspicion and scrutiny over him and the Restis family businesses, crippled his ability to conduct business around the world, caused him and the Restis Family businesses to suffer enormous and irreparable financial and economic damages, inflicted

extreme and irreparable emotional distress and harm, and successfully incited hatred, personal attacks and threats of violence against Mr. Restis and his businesses, including, as examples, the death threats, slurs and vile comments posted on UANI's Facebook page in response to its false campaign, including: *"JUST SHOOT HIM" "Hang him!!!!" "shoot that pos" "Go get his ass" "torpedo his ships," "lock and load torpedoes,"* and *"we should sink his ships in middle of the sea."*

19.    In a further effort to mitigate the irreparable harm and ongoing havoc that Defendants have wreaked on Mr. Restis and his ability to carry on his businesses and daily affairs, on July 3, 2013, counsel for Mr. Restis sent a detailed 17-page cease and desist letter to Mr. Wallace and UANI, with facts and information demonstrating the falsity of their accusations and urging Defendants to take immediate and necessary remedial measures, including:  (1) immediate removal of all publications falsely accusing Mr. Restis from UANI's website, and any other locations where they have been posted or otherwise published, (2) identification of the sources on which Defendants based their false assertions, (3) payment of all legal fees and costs incurred by Mr. Restis and the Restis family businesses due to Defendants' false and defamatory publications, (4) prompt publication of a specified Retraction and Apology, (5) prompt dissemination of the Retraction and Apology to all media outlets and other entities that have received any of UANI's press releases and/or republished and of UANI's false assertions, all recipients or Mr. Wallace's May 13, 2013 letter to Mr. Restis, and each individual who signed his or her name to UANI's Call for Action against Mr. Restis, and (6) prompt publication of the specified and unqualified Retraction and Apology in six national and six international newspapers of Mr. Restis' choice, at Defendants' expense.

20.     As further evidence of their malicious intent to destroy Mr. Restis'
reputation and cripple the Restis family shipping business, Defendants have not only refused to
take the remedial actions requested in the July 3, 2013 Cease and Desist letter, they responded by
publishing yet another press release on July 15, 2013.  In a stunning and unconscionable display
of hubris, despite Defendants' admission that Mr. Restis "is not currently engaged in business
dealings with Iran," they have republished their previous falsehoods in UANI's July 15, 2013
press release and ratcheted up their malicious and spiteful attack by using the prominent
headline: *"UANI Calls for U.S. Investigation and for Restis to be Barred from U.S. Business."*
Further, because Mr. Restis has not bowed to Defendants' demands, in an apparent fit of pique,
UANI has boldly pronounced in its release: *"Until Mr. Restis fully explains and transparently*
*reveals his involvement in these matters, we call upon the United States Federal Government,*
*states and relevant port authorities to refuse further business with Mr. Restis and his related*
*businesses and deny him relevant licenses and authority to engage in U.S. based business."*

21.     Mr. Restis has been left no recourse other than to bring this action to
vindicate his rights and restore his reputation and the reputation of the Restis family businesses.
Because of the extraordinary and as yet incalculable magnitude of the economic loss and special
damages caused by Defendants false "name and shame" reputation destruction campaign, the
extreme emotional distress inflicted upon Mr. Restis and the irreparable harm caused by
Defendants' tortious conduct, Mr. Restis and the Restis family companies are entitled to
compensatory damages in an amount to be determined at trial.  Given the willful, malicious,
intentional and reckless nature of Defendants' conduct, Mr. Restis is also entitled to punitive
damages.

## THE PARTIES

22.     Plaintiff Victor Restis is a citizen of Greece and resides in Ellinikon, Greece.  Mr. Restis is a highly successful and respected entrepreneur in a wide variety of industries, including shipping, banking, energy, telecommunications, real estate, and media and entertainment industries.   He is among the largest and most successful ship owners in Greece, and his various companies employ thousands of individuals.  In 2012, the reputable shipping publication Lloyd's of London ranked Mr. Restis as among the top one hundred most influential individuals in the international shipping industry.  Mr. Restis has received numerous national and international awards for business ethics and activities in the shipping industry, and he has been appointed as the Vice Chairman of the Greek Committee of Det Norske Veritas, a classification society founded in 1864 with the objective of "safeguarding life, property, and the environment" that operates in 100 countries.  Mr. Restis also currently serves as the San Marino Ambassador to Poland.

23.     Mr. Restis' companies have been recognized and distinguished by various international organizations, academic institutions, governments and other authorities.   He maintains offices in numerous countries around the world, including many European countries. He also has developed significant business activities in the United States, where his companies' oil tankers make 50 percent or more of their transports.   At the same time, the majority of shipping businesses in which Mr. Restis has an ownership interest are listed on the New York Stock Exchange, including South African Marine Corp. and Sea Star Capital.

24.     Mr. Restis also served as the CEO of Plaintiff FBB, a commercial bank founded in November 2001 that offered financial services to individuals, professionals and businesses in Greece.  Its principal place of business is in Greece.  The majority of FBB's assets

and liabilities were purchased by the National Bank of Greece in May 2013. As alleged herein, FBB is a target of the campaign of defamation and disparagement unlawfully waged by Defendants.

25.     Plaintiff EST is organized under the laws of the country of Greece, with its principal place of business in Liberia. EST is one of the largest off-shore shipping companies worldwide and is the flagship of the Restis family shipping business. It was established in 1974 by Stamatios Restis, Mr. Restis' father, and it manages a fleet of ocean-going reefer, bulk and container vessels for world-wide transportation, serving international trade in a large range of perishable products and general cargo. It manages more than ninety-two (92) ships, and employs more than 2,800 sailors and approximately 200 employees in its offices in Greece. The commercial value of its fleet exceeds $2.5 billion. EST has been certified by the European Foundation for Quality Management with a four-star Recognized for Excellence Certificate since 2007. The European Business Ethics network has recognized EST with a Silver Bee Certificate since 2008 and a Gold Bee Certificate since 2009. In 2009, EST was also named "Innovation Leader" by major Greek shipping magazine *Naftika Chronika,* and in 2010, the International Propeller Club of the United States presented EST with an award for "selfless and outstanding efforts" by one of its ships to rescue the captain of another ship off of the coast of Hawaii. EST is listed in the New York Stock Exchange, its greatest volume of trading lies in the United States, and its major suppliers and customers are Americans and American companies.

26.     Upon information and belief, Defendant American Coalition Against Nuclear Iran, Inc. is a not-for-profit corporation organized under the laws of the State of New York, with a principal place of business in New York, New York. UANI maintains a website located at http://www.unitedagainstnucleariran.com, on which it states that it "seeks to prevent

Iran from fulfilling its ambition to obtain nuclear weapons" and engages in "private sanctions campaigns and state and Federal legislative initiatives focus on ending the economic and financial support of the Iranian regime by corporations . . . ." UANI claims on its website that it has had "unprecedented success in pressuring multinational corporations to cease business in Iran . . . ."

27.     Upon information and belief, Defendant Mark D. Wallace is a citizen of New York, residing in New York City.  Mr. Wallace is a co-founder of UANI and currently serves as its CEO, for which he has received compensation.  Mr. Wallace is a former representative of the Management and Reform Section of the U.S. Mission to the United Nations More specifically, "The U.S. Mission's Management and Reform (MR) Section serves as the U.S. delegate to the General Assembly's Fifth Committee and other committees which have responsibility for administrative and budgetary matters." (www.usun.state.gov).   While Mr. Wallace refers to himself as "Ambassador Wallace," and has been featured in media broadcasts and press reports saying and suggesting that he was the United States Ambassador to the United Nations, this is not the case.  In fact, Mr. Wallace has never held the post of The United States Ambassador to the United Nations.  Defendant Wallace is sued in his individual capacity and in his official capacity as an officer of UANI.

28.     Upon information and belief, Defendant David Ibsen is a citizen of New York, residing in New York City.  He receives compensation as the Executive Director of UANI. Defendant Ibsen is sued in his individual capacity and in his official capacity as an officer of UANI.

29.     Upon information and belief, Defendant Nathan Carleton is a citizen of New York, residing in New York City.   Mr. Carleton receives compensation as the

Communications Director for UANI.  Defendant Carleton is sued in his individual capacity and in his official capacity as an officer of UANI.

30.     Plaintiffs are unaware of the true names and capacities of defendants sued herein as DOES 1-10, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously-named defendants is responsible in some manner for the occurrences alleged herein, and that Plaintiffs' damages were proximately caused by their conduct.

31.     Upon information and belief, all of the acts and failures to act alleged herein were duly performed by and attributable to all Defendants, each acting as agent, co-conspirator, alter ego, associate, co-venture and/or under the direction and control of the others, and that said acts and failures to act were within the scope of said agency, employment, alter ego, direction, co-venturing and/or control of the others.  To the extent that said conduct was engaged in by Defendants Wallace, Ibsen, Carleton, and UANI, the remaining defendants participated in, benefitted by, confirmed and/or ratified said conduct.  Whenever and wherever reference is made in this complaint to any acts of Defendants, such allegations and references shall also be deemed to mean the acts of each and every remaining DOE defendant acting individually, jointly or severally.  All Defendants, collectively, and each Defendant separately, are jointly and severally liable to Plaintiff as alleged hereunder for all damages, costs, and such other sums as are sought and may be awarded by the Court.

## JURISDICTION AND VENUE

32.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that this is an action between a citizen of a State and a citizen or subject of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

33.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that Defendants UANI, Wallace, Ibsen, and Carleton reside in this judicial district and a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTUAL BACKGROUND

**Defendants Repeatedly Defame And Disparage Mr. Restis And
His Family's Businesses By Employing Multiple Methods Of
Communication And Globally Disseminating At Least 15
Publications In Their False "Name And Shame" Campaign**

34.    As described above, UANI's stated goal is to prevent Iran from fulfilling its ambition to obtain nuclear weapons, and it accomplishes this goal by using shaming and reputation destruction tactics to conduct "private sanctions campaigns."   Using this *modus operandi*, UANI "pressures" multinational corporations "across a broad array of sectors ranging from telecommunications to defense contracting, to cease business in and with Iran."   In addition, through its website, UANI prompts the public to contact companies that it has reported doing business with Iran, as well as members of the press and congressional representatives.  To that end, UANI claims to provide accurate information to the public about companies' dealings with Iran, so that individuals can "make informed purchasing, investment and divestment decisions."  According to UANI, the information it provides on its website is a "resource used widely by the media, professional researchers and academics, elected officials, and policy makers."

35.     UANI recently launched its "Shipping Campaign" to target international cargo shippers, among others, to ensure that the Iranian regime's shipping and port sectors are isolated from international markets as long as Iran pursues nuclear weapons capability. According to UANI's website, in March 2013, it called on all U.S. port authorities to deny docking privileges to all shipping companies that continue to do business in Iran, and at the same time, its campaign "applied strong pressure directly on international shipping companies to pull out of Iran."

36.     Shortly after launching its "Shipping Campaign," on May 13, 2013, UANI sent a public letter ("Letter") to Mr. Restis as the Chairman of FBB, in which Mr. Wallace repeatedly made false, highly inflammatory and defamatory statements that Mr. Restis, FBB, and EST are engaged in "apparent business dealings" with "sanctioned-designated individuals and Iranian oil and shipping entities."   In the Letter signed by Mr. Wallace, UANI also communicated the false and defamatory message that Mr. Restis was engaged in a "relationship" "to illegally export Iranian oil in violation of international sanctions" with Greek businessman Dimitris Cambis, who had been sanctioned by the United States for conspiring with the Iranian regime and Iran's Ministry of Petroleum ("MoP").   The Letter includes the false and highly alarming message that Mr. Restis, FBB and EST are engaged in a "significant and potentially lucrative illicit business relationship" with Cambis and the MoP, and serve as "front-men for the illicit activities if the Iranian regime."   (A copy of the Letter is attached hereto as **Exhibit A**.)

37.     In the Letter, UANI claims that Mr. Restis' illegal and illicit relationship with Iran is confirmed by purported "documentation" it has received.   Specifically, the Letter states:

> UANI has been provided recent documentation confirming the existence of a significant and potentially lucrative illicit business relationship between FBB, of

which you serve as Chairman, Cambis, and the Iranian MoP.  The documents demonstrate that you, through FBB, and in conjunction with Cambis, are conspiring with individuals acting on behalf of the Iranian regime to serve as a front for the MoP in Greece by securing a "strategic alliance" with the regime wherein FBB will receive investments apparently in excess of one billion dollars from Iranian authorities.  Put simply, you are providing extensive and critical shipping and financial services to the Iranian regime and facilitating the expansion of its oil industry, in flagrant contravention of the international sanctions regime.

38.    The "documentation" relied upon by UANI to confirm and "corroborate" its patently false and damaging accusations that Mr. Restis is a criminal in league with the Iranian regime for profit, consists of two fraudulent and facially unreliable documents: (1) a purported letter from Cambis dated April 25, 2012, addressed to Mr. Restis and Professor Christos Kazantzis as the CEO of FBB, in which Cambis purportedly "defines" the relationship between his company (Athene Consulting House) and the Iranian MoP, and allegedly identifies Mr. Restis and FBB as a "potential partner in this illicit Iranian investment scheme"; and (2) a purported "agreement letter" dated April 25, 2012, from a Cypriot consulting company, Concept Consulting Ltd., to Mr. Restis as the Chairman of FBB, purportedly confirming FBB's supposed engagement of Concept Consulting to attract "major international investors" and which references Iranian investors with alleged ties to the MoP.

39.    Defendants sent their false and defamatory Letter to Mr. Restis and to at least eighteen other individuals, including senior Members of Congress, representatives of the Obama Administration, and members of the Greek Government.  For example, UANI sent the Letter defaming and disparaging Mr. Restis and his businesses to U.S. Secretary of Defense Chuck Hagel, U.S. Treasury Undersecretary for Terrorism and Financial Intelligence David S. Cohen, Chairman of the House Committee on Foreign Affairs Ed Royce, Chairman of the Senate Committee on Banking, Housing, and Urban Affairs Tim Johnson, Greek Ambassador to the

United States Christos P. Panagopolous, and American Ambassador to Greece Daniel Bennett Smith.

40.     UANI repeated these false, highly damaging and defamatory statements in two press releases issued on May 13, 2013: (a) a press release graphically depicting six hands linked around a map of Iran and promoting the distribution of the Letter, in a posting titled *"UANI Calls for Greek Ship Owner Victor Restis and Restis Group to End Illicit Business Relationships with Iranian Regime;   Restis is Conspiring with Regime & Blacklisted Businessman Dimitris Cambis to Profit from Iranian Business Schemes"*; and (b) a press release graphically depicting two large images of Iran President Mahmoud Ahmadinejad and promoting the distribution of the Letter and related postings, titled *"UANI Calls for Greek Ship Owner Victor Restis and Restis Group to End Illicit Business Relationships with Iranian Regime;   Restis is Conspiring with Regime & Blacklisted Businessman Dimitris Cambis to Profit from Iranian Business Schemes"* (collectively referred to as "May 13 Press Releases").  (Copies of the May 13 Press Releases are attached hereto as **Exhibit B**).  These press releases name Defendant Nathan Carleton as the contact for media inquiries and provide his email address and phone number.  Upon information and belief, the May 13 Press Releases have been posted on UANI's website since at least May 14, 2013.

41.     UANI further disseminated these false, highly damaging and defamatory statements in two press releases issued on May 14, 2013: (a) one press release graphically depicting six hands linked around a map of Iran titled *"UANI Issues Statement to Greek Ship Owner Victor Restis, UANI Calls on Restis to Disclose All Iran Business Transactions"*; and (b) one press release graphically depicting two large images of Iran President Mahmoud Ahmadinejad, *"UANI Issues Statement to Greek Ship Owner Victor Restis, UANI Calls on Restis*

*to Disclose All Iran Business Transactions"* (collectively referred to as "May 14 Press Releases"). (Copies of the May 14 Press Releases are attached hereto as **Exhibit C**). These press releases again name Defendant Nathan Carleton as the contact for media inquiries. Upon information and belief, the May 14 Press Releases have been posted on UANI's website since at least May 14, 2013.

42.    UANI further disseminated the false and defamatory statements in a sensationalized "call to action" posted on its website (http://www.unitedagainstnucleariran.com) on or about May 13, 2013 ("Call to Action"). When readers accessed the UANI website, the first thing they see across the top of the main webpage is a large photograph of Mr. Restis with a picture of a tanker ship in front of him, along with an active link titled: "Call on Greek Businessman VICTOR RESTIS & RESTIS GROUP ENTITIES to end all Iran business schemes." When readers click on this link, they are taken to a webpage entitled "Action Alert," which encourages readers of the UANI website to "Take Action" by providing their names and contact information so UANI could convey a demand from these individuals to Plaintiffs to end their purported role as "front-men for the illicit activities of the Iranian regime" and their "very significant, unethical - indeed illegal - support to the Iranian MoP and its affiliate, NITC." (A copy of the Call to Action is attached hereto as **Exhibit D**). Plaintiffs are informed and believe that the "Call to Action" remained continuously and prominently displayed across the top of the main webpage of the UANI website from May 13, 2013, until such time as UANI removed the substance of the Call to Action from its website on or about May 23, 2013. However, the Call to Action is still publicly available at http://www.capwiz.com/unitedagainstnucleariran/issues/alert/?alertid=62661211&type=CU.

43.     UANI further disseminated the false and defamatory statements on its Facebook page on or about May 14, 2013 ("May 14 Facebook Post"). In the post, UANI wrote that it "has unveiled evidence showing that this Greek shipowner, Victor Restis, is engaged in illicit business with the Iranian regime. TAKE ACTION!" The text includes a link to the Call to Action. (A copy of the May 14 Facebook Post is attached hereto as **Exhibit E.**) As of July 8, 2013, 379 individuals had indicated that they "liked" this page on Facebook, and 112 individuals had further disseminated the page by "sharing" it on their Facebook pages.

44.     In response to UANI's Facebook post, visitors left at least 33 comments, including hateful, vile and threatening messaged directed to Mr. Restis. For example, the comments call Mr. Restis a "bastard," an "animal," a "Greek f\*\*k," a "crook," a "piece of crap," a "self satisfied smug bastard without any scruples," a "Christian pig," and an "evil, greasy, greedy bastard." Comments threatening death and violence against Mr. Restis, include:

- *"Hang him!!!!"*

- *"JUST SHOOT HIM."*

- *"Lock and load torpedoes......FIRE ONE.....release the sharks...."*

- *"shoot that pos [piece of s\*\*t]"*

- *"Go get his ass."*

45.     UANI posted an additional defamatory publication on its Facebook page on or about May 14, 2013 ("2nd May 14 Facebook Post"). According to the post, "Update: Victor Restis has responded to UANI's campaign. UANI calls for Mr. Restis to immediately clarify any and all business deals that he, FBB and/or affiliated entities have in or with Iran." The Facebook post contains a link to UANI's press release untitled *"UANI Issues Statement to Greek Ship Owner Victor Restis, UANI Calls on Restis to Disclose All Iran Business*

*Transactions.*" As of July 8, 2013, 129 readers indicated that they "liked" this post, and 18 shared it with others. Three individuals left comments, including one that stated about Mr. Restis, "Deals with Islamic countries – that makes him a traitor to the human race." (A copy of the 2nd May 14 Facebook Post is attached hereto as **Exhibit F.**)

46.    UANI further disseminated the false and defamatory statements on its social media Twitter feed on or about May 14, 2013 ("May 14 Tweet"), and the "tweet" remains posted there to the present day. Next to a large and menacing photograph of Iranian Supreme Leader Ayatollah Ali Khamenei, UANI "tweeted" the message that "UANI has unveiled evidence showing that this Greek shipowner, Victor Restis, is engaged in illicit business with the Iranian regime." The tweet contained a link that, if clicked by users, would take them to UANI's disparaging Facebook post with Mr. Restis' head surrounded by red arrows. This tweet was re-tweeted (shared across Twitter by other users) twice. (A copy of the May 14 Tweet is attached hereto as **Exhibit G.**)

47.    UANI disseminated the false and defamatory statements again on its Twitter feed on or about May 14, 2013 ("May 14 Update Tweet"), and the "tweet" remains posted there to the present day. Again, next to a large and menacing photograph of Ayatollah Khamenei, UANI tweeted, "Update: Victor Restis has responded to UANI's campaign. UANI calls for Mr. Restis to immediately clarify any and all business deals that he, FBB and/or affiliated entities have in or with Iran." The tweet contained a link to the Facebook page containing the photograph of Mr. Restis with a superimposed pirate's eye patch. (A copy of the May 14 Update Tweet is attached hereto as **Exhibit H.**)

48.    UANI further disseminated these false, highly damaging and defamatory statements in two press releases issued on July 15, 2013: (a) one press release graphically

depicting six hands linked around a map of Iran titled *"UANI Issues Statement Regarding Greek Ship Owner Victor Restis; UANI Calls for U.S. Investigation and for Restis to be Barred from U.S. Business"*; and (b) one press release graphically depicting two large images of Iran President Mahmoud Ahmadinejad, *"UANI Issues Statement Regarding Greek Ship Owner Victor Restis; UANI Calls for U.S. Investigation and for Restis to be Barred from U.S. Business"* (collectively referred to as "July 15 Press Releases").   These press releases again name Defendant Nathan Carleton as the contact for media inquiries.  The press releases responded to a letter dated July 3, 2012 from Plaintiffs' counsel explaining in no uncertain terms the falsity of Defendants' statements regarding Mr. Restis and demanding that Defendants immediately retract those statements and issue an apology.  The press releases, which took the form of a "statement" from Defendant Wallace, initially attempted to minimize Defendants' earlier defamation by claiming – falsely – that UANI merely expressed its "serious concerns related to documents and statements that purport to show business dealings by and between Mr. Restis and related companies with the sanction-designated Greek businessman Dimitris Cambis and Iran." Nevertheless, the statement repeats its earlier defamation and assumes it to be true.  It referred to a *"dark cloud surrounding [Mr. Restis'] previous dealings"* and claimed that Mr. Restis *"fail[ed] to adequately describe his activities related to Mr. Cambis and the transactions referred to in the documents that involve Mr. Restis,"* even though those "dealings" and "transactions" never occurred.  The statement called on the U.S. Government to investigate Mr. Restis, and it claimed that UANI would turn over any relevant materials to U.S. authorities.  The July 15 Press Release contained hyperlinks to UANI's previous defamatory statements, including the May 13, 2013 Letter and other correspondence, thereby further disseminating the defamatory statements.  (A copy of the July 15 Press Releases is attached hereto as **Exhibit I**.)

49.     UANI further disseminated the false and defamatory statements on its Facebook page on July 15, 2013 (July 15 Facebook Post).  It posted a photograph of Mr. Restis with a guilty look on his face superimposed on top of an Iranian oil tanker.  In bold white text against a blue background, the graphic reads, "UANI Calls on U.S. Law Enforcement Authorities, Regulators and Lawmakers to Fully Investigate Mr. Restis and His Related Businesses."  According to text accompanying the graphic, "UANI Issues Statement Regarding Greek Ship Owner Victor Restis: UANI calls for U.S. investigation and for Restis to be BARRED from U.S. business!"  The text contains a hyperlink to the July 15 Press Release posted on UANI's website.  As of July 18, 2013, this post had been "shared" 33 times by readers and had been "liked" by 149 readers.  One reader posted a comment threatened violence against Mr. Restis, advocating that someone should "[k]eelhaul the Malaka."  "Keelhauling" is a painful form of naval punishment or torture involving dragging an individual underneath the keel of a ship while tied by both arms.  "Malaka" is a Greek term of derision.  (A copy of the July 15 Facebook Post is attached hereto as **Exhibit J**.)

50.     Defendants further disseminated their false and defamatory statements through two tweets sent to its followers and posted on its Twitter site.  On July 15, 2013, next to the photograph of a menacing looking Ayatollah Khamenei, UANI tweeted that "UANI Issues Statement Regarding Greek Ship Owner Victor Restis: UANI calls for U.S. investigation and for Restis..." ("July 15 Tweet").  The tweet contained a hyperlink to the July 15 Facebook Post.  (A copy of the July 15 Tweet is attached hereto as **Exhibit K**.)  According to a second tweet dated July 16, 2013, "UANI's turning over materials to U.S. lawmakers to shed light on Greek shipowner Victor Restis' past #Iran business" ("July 16 Tweet").  The tweet contained a

hyperlink to the July 15 Press Release on UANI's website.  (A copy of the July 16 Tweet is attached hereto as **Exhibit L**.)

51.     The Letter, Press Releases, Call to Action, Facebook pages, and tweets are collectively referred to as the "UANI Publications."  Upon information and belief, the UANI Publications are the joint product of all Defendants.

52.     The UANI Publications had their intended effect.  As a result of their publication, Defendants' false and disparaging statements were widely disseminated and re-published by numerous media outlets, as well as a multitude of websites and blogs.

### Defendants Crafted Words, Graphics, Images, Captions And Content To Destroy Mr. Restis' Reputation, Cripple His Ability To Conduct Business And Inflict The Greatest Possible Emotional Distress On Mr. Restis And His Family

53.     The content, words, graphics, images and captions in the Letter, when considered in context, repeatedly and literally communicate the false, defamatory *per se,* and highly damaging message that Plaintiffs are engaged in criminal, unethical, and illicit conduct with the Iranian regime.

(a)     "United Against Nuclear Iran ('UANI') is writing to express its serious concern about the apparent business dealings of two of your companies, namely First Business Bank S.A. ('FBB') and Enterprises Shipping and Trading S.A. ('EST'), with sanctioned-designated individuals and Iranian oil and shipping entities."

(b)     "UANI is seriously alarmed by your relationships with Dimitris Cambis, President of Athene Consulting House S.A. ('Athene'), a notorious Greek businessman recently sanctioned by the U.S. government for conspiring with

the Iranian regime and Iran's Ministry of Petroleum ('MoP'), to illegally export Iranian oil in violation of international sanctions."

(c) "In addition to Cambis, the other partner in this illicit business relationship is the Iranian MoP."

(d) "Clearly, the purpose of the partnership between FBB and the stigmatized and sanctioned Cambis, and MoP, respectively, is to secure Iranian regime control over FBB, a non-sanctioned and seemingly legitimate entity headed by an ostensibly credible Greek businessman with the façade of an EU-protected financial institution, in order to enable the Iranian regime to engage in, and enlarge, its fraudulent financial and shipping activity in exchange for an enormous investment from the Iranian regime."

(e) "UANI is also in possession of a second document corroborating the main details of the first, namely that the Iranian MoP plans to invest heavily in FBB. The second document is an agreement letter – addressed to you in your role as Chairman of FBB – and is apparently written by a Cypriot consulting company, CONCEPT CONSULTING Ltd.  With no notable online presence aside from a poorly constructed Facebook page, CONCEPT CONSULTING is in all likelihood a front company, set up for the sole purpose of enabling the deal between FBB and the MoP by imparting the relationship with an undeserving veneer of legitimacy."

(f) "The document confirms FBB's engagement of CONCEPT CONSULTING for the purpose of attracting 'major international investors who will participate in the purchase of FBB-First Business Bank share capital and/or acquisition of

any other financial institution through FBB...'  Alarmingly, the document then cites the exact same trio of Iranian individuals referenced in the first document as representatives of the Iranian MoP: '...*introducing major investors namely Sir Kazem Vaziri, Mr Homayoun Ansari and Dr M. Ali Izadi and/or any legal entity indicated by them*("*Matter*").'"

(g)     "Both documents – the letter from Cambis and the consultancy engagement agreement letter – confirm the existence of a scheme in which FBB serves as a front for the MoP in exchange for an infusion of investment from the Iranian regime.  Clearly, you and Cambis are acting as front-men for the Iranian MoP, enabling the regime to massively expand its capacity to finance illicit shipping operations."

(h)     "[I]t appears that another Restis Group company, EST, is also being used to aid Iran in its evasion of international sanctions.  EST describes itself as 'a leading provider of ship management services,' and manages an eighty-one strong ocean-going fleet of bulk, container, tanker and reefer vessels, as well as cruise ships.  UANI has been informed that EST-managed ships are very likely being used by Iran to illegally transport its oil in a concerted effort to evade U.S., EU, and international sanctions."

(i)     "Through both open and private sources, UANI is cognizant of the financial difficulties currently facing you and certain Restis Group companies. . . . These significant personal financial and legal difficulties, no matter how dire, still offer absolutely no justification for the provision of vital services to the Iranian regime in return for its investment."

(j)     "The services provided by FBB to your sanctioned Iranian partners are in the most highly sensitive and sanctioned areas of the Iranian economy, namely oil and shipping.   Indeed, the Iranian regime is highly dependent on oil – its most valuable commodity.   Furthermore, the vessels, maritime services and financing provided by the international shipping community facilitate the regime's continued export of oil, and enable the regime's dangerous behavior and continued defiance of international law.  The revenue generated from the sale of Iran's oil allows the Iranian regime to continue its pursuit of an illicit nuclear weapons program, as well as to fund its terrorist proxies worldwide and ultimately, to maintain its brutal grip on the levers of power."

(k)     "Most recently, on May 11, it was announced that FBB is to be split into a 'good' and a 'bad' bank due to 'rising bad debts and losses' and 'would be wound down as part of a wider restructuring of the banking sector...' (*Reuters*, "Greece splits up small troubled lender FBBank," 5/11/13)  In addition, you stand accused of property-related tax evasion charges due to intentional undervaluing of investments in Cyprus, and currently owe a fine of €31.6 million to the Greek authorities. (*E-net Gr.*, "Πρόστιμο-μαμούθ 31,6 εκατ. για Ρέστη [Enormous fine of €31.6 million for Resti]," 1/31/13)."

(l)     "Furthermore, ostensibly as a result of the more stringent capital requirements for banks in the wake of the Basel II rules, FBB executives and shareholders – of which you are chief among them – are accused of taking out loans from the Greek state worth hundreds of millions of Euros.  These loans are unlikely to ever be repaid (to the Greek tax-payer). (*Directnews.gr*, "Ύποπτα δάνεια από

την FBBank του Βίκτωρα Ρέστη [Suspect Loans by FBBank of Victor Resti],"

11.6.12)"

54.    The May 13 Press Releases, which Plaintiffs are informed and believe have been posted on UANI's website since at least May 14, 2013, both re-publish the false and misleading Letter.   In addition, both May 13 Press Releases communicate the following additional false and defamatory *per se* assertions of fact:

(a)    "UANI Calls for Greek Ship Owner Victor Restis and Restis Group to End Illicit Business Relationships with Iranian Regime."

(b)    "Restis is Conspiring with Regime & Blacklisted Businessman Dimitris Cambis to Profit from Iranian Business Schemes."

(c)    "Today, United Against Nuclear Iran (UANI) unveiled evidence of illicit business practices between Victor Restis, Chairman of Greece's First Business Bank S.A. (FBB), and the Iranian regime."

(d)    "UANI has written to Mr. Restis, presenting evidence of a significant and potentially lucrative relationship between FBB, blacklisted Greek businessman Dimitris Cambis, and Iran's Ministry of Petroleum (MoP)."

(e)    "The documents demonstrate that Mr. Restis, through FBB and in conjunction with Mr. Cambis, is conspiring with individuals acting on behalf of the Iranian regime to serve as a front for the MoP in Greece by securing a 'strategic alliance' with the regime.   In exchange, FBB will receive investments apparently in excess of one billion dollars from Iranian authorities."

55.    The May 14 Press Releases, which Plaintiffs are informed and believe have been posted on UANI's website since at least May 14, 2013, re-publish both the false and

misleading Letter and the false and defamatory statements disseminated through the May 13 Press Releases.  In addition, both May 14 Press Releases communicate the following additional false and defamatory *per se* assertions of fact:

    (a)    "Yesterday, UANI unveiled documented evidence of illicit business practices between Restis, and the Iranian regime."

    (b)    "The documents demonstrate that Restis, through FBB and in conjunction with Mr. Cambis, is conspiring with individuals acting on behalf of the Iranian regime to serve as a front for the Iranian Ministry of Petroleum in Greece by securing a 'strategic alliance' with the regime."

    (c)    "In exchange, FBB will receive investments apparently in excess of one billion dollars from Iranian authorities."

    56.    The Call to Action, which Plaintiffs are informed and believe was posted continuously on UANI's website beginning on or about May 14, 2013, until such time as UANI removed the substance of it from its website.  The Call to Action communicates the following false, misleading and defamatory *per se* content:

    (a)    Website viewers are urged to *"Take Action"* by providing their names and contact for UANI to convey a demand that the Restis Entities end their role as *"front-men for the illicit activities of the Iranian regime."*

    (b)    Viewers are further urged to *"Take Action"* to end the Restis *entities "very significant, unethical – indeed illegal – support to the Iranian MoP and its affiliate, NITC."*

57.     The July 15 Press Release, which Plaintiffs are informed and believe has been posted on UANI's website since at least July 15, 2013, communicates the following false, misleading and defamatory *per se* content:

(a)     "UANI first contacted Victor Restis in May regarding our serious concerns related to documents and statements that purport to show business dealings by and between Mr. Restis and related companies with the sanction-designated Greek businessman Dimitris Cambis and Iran."

(b)     "UANI has repeatedly offered to work collaboratively with Mr. Restis and his counsel to clarify the numerous documents and statements that describe dealings between Mr. Restis, Mr. Cambis and Iran.

(c)     Defendants claim to have "[o]ffered to show Mr. Restis and his counsel extensive additional documents that implicate Mr. Restis in activity related to Iran and Mr. Cambis."

(d)     Defendants claim that their earlier defamatory statements are based on "(highly credible) confidential sources," as well as *valid research, credible documents, distinguished relationships, and preeminent sourcing*."

(e)     Defendants claim that Mr. Restis' "explanation [in response to their allegations] has been limited and made in either the press or in carefully crafted legal statements."

(f)     "Mr. Restis' counsel has further stated that he is 'not engaged in illegal business schemes with Iran' [emphasis added by Defendants] without reference to any timeframe. That letter is quite lengthy, and UANI remains concerned that its

length masks a lack of substantive explanation and its length is mostly a repetition of UANI letters."

(g)     "*Mr. Restis has not sought to explain his past interactions related to these matters.*"

(h)     "UANI works with a variety of companies and persons, in most cases collaboratively and positively, to end their business in Iran. UANI is typically the first to applaud *any* party that takes complete and transparent action to reveal the nature and extent of its Iran related dealings and/or business and exits Iran. *UANI cannot take such action related to Mr. Restis because of the dark cloud surrounding his previous dealings related to these matters.*"

(i)     "Mr. Restis has refused to adequately clarify these matters."

(j)     "*Given Mr. Restis' failure to adequately describe his activities related to Mr. Cambis and the transactions referred to in the documents that involve Mr. Restis, UANI calls on U.S. law enforcement authorities and regulators and U.S. lawmakers to fully investigate Mr. Restis and his related businesses. Until Mr. Restis fully explains and transparently reveals his involvement in these matters, we call on the United States Federal Government, states and relevant port authorities to refuse further business with Mr. Restis and his related businesses and deny him relevant licenses and authority to engage in U.S.-based business.*"

58.     The July 16 Tweet, which Plaintiffs are informed and believe has been posted on UANI's website since at least July 16, 2013, communicates the following false, misleading and defamatory *per se* content:

(a)   "UANI's turning over materials to U.S. lawmakers to shed light on Greek shipowner Victor Restis' past #Iran business"

**The Outrageous Graphics And Content Posted On Defendants'
Website And Facebook Page To Defame And Disparage Mr. Restis
And Restis Family Businesses Drips With Malice**

59.   Defendants prominently and continuously displayed various images that depict Mr. Restis in a false and defamatory manner.

60.   An image of Mr. Restis on the UANI website homepage since at least May 14, 2013 portrays him to be engaged in a nefarious scheme with the Iranian regime and the National Iranian Tanker Company.   Defendants have taken steps to ensure that a click on Mr. Restis' image immediately triggers a sensational banner to flash across the page.   Defendants' banner and graphics posted on the UANI website communicate the following false, misleading and defamatory *per se* messages:

(a)   *"Call on Greek businessman VICTOR RESTIS & RESTIS GROUP ENTITIES to end all Iran business schemes!"*

(b)   The accompanying graphic positions Mr. Restis' head – with a guilty look on his face – over an Iranian oil tanker with the letters "NITC," communicating that this a National Iranian Tanker Company tanker.

(c)   UANI's graphic is superimposed on additional graphics depicting smoke from a missile launch, Revolutionary Guards cheering during a rally, and the head of Ayatollah Khamenei.

(d)   UANI also positions Mr. Restis' head over the image of Ayatollah Khamenei, making it appear that Mr. Restis is wearing the ayatollah's turban.

61.     In addition, Defendants have prominently and continuously displayed the Facebook posts, which communicate the following false, misleading and defamatory *per se* messages:

(a)     The May 14 Facebook Post included a highly sensationalized graphic depicting a photograph of Victor Restis below a photograph of an oil tanker with the letters NITC, indicating a National Iranian Tanker Company tanker.  A series of five bright red arrows are superimposed in a circle around Mr. Restis' head, pointing directly at him in accusatory fashion.  The graphic also includes the prominently displayed words "dirty business: CHECK" printed in bright red.

(b)     The 2nd May 14 Facebook Post consists of a graphic image of Mr. Restis smiling, with a pirate's eye patch superimposed over his left eye and the words "HOLY SHIP!" in large letters across the bottom.

(c)     The July 15 Facebook Post included the graphic described above on UANI's website, with a photograph of Mr. Restis with a guilty look on his face superimposed on top of an Iranian oil tanker.  In bold white text against a blue background, the graphic reads, "UANI Calls on U.S. Law Enforcement Authorities, Regulators and Lawmakers to Fully Investigate Mr. Restis and His Related Businesses."

### Defendants' "Name And Shame" Campaign Defaming And Disparaging Mr. Restis And Restis Family Businesses Is Demonstrably False

62.     There is no factual basis for UANI's repeated false, highly offensive and defamatory *per se* assertions that Mr. Restis and his companies are "front-men" engaged in "criminal" and "illicit" business "schemes" the Iranian regime, MoP or its affiliate, National Iranian Tanker Company.  In fact, Mr. Restis is engaged, nor has he been engaged is any illegal

or illicit business arrangement, transaction or scheme of any kind with Cambis or the companies or entities he represents.  Neither Mr. Restis nor Restis family businesses have had an illegal or illicit business arrangement, transaction or scheme of any kind with any other sanctioned entity, including the National Iranian Oil Company and/or the National Iranian Tanker Company. Contrary to Defendants' false assertions, Mr. Restis, FBB and EST have not violated the sanctions against Iran, nor have they had any illicit business dealings with sanctioned individuals.

63.     As specified above, Defendants wrongly relied on and materially mischaracterized two fraudulently and patently unreliable documents to "corroborate" their patently false and defamatory *per se* reputation destruction campaign: (1) a purported letter from Cambis dated April 25, 2012, addressed to Mr. Restis and Professor Christos Kazantzis as the CEO of FBB,  and (2) a purported "agreement letter" dated April 25, 2012, from a Cypriot consulting company, Concept Consulting Ltd., to Mr. Restis.

64.     The purported Cambis Letter mischaracterized by Defendants is a fraudulent and patently unreliable source and, in fact, refutes Defendants' false and defamatory accusations for multiple reasons:

(a)     According to the purported letter, the writer has "been mandated, among others, to **propose** a Greek financial institution whereas our clients [the MoP] wish to participate in the share capital and bring along a major part of their businesses."

(b)     The writer of the purported letter says that "we have **proposed** FBB" as a business partner."

(c)     The purported letter attached a "**draft proposal** of our cooperation."

65.     Additionally, the purported Cambis letter is a patently suspect and unreliable source for multiple reasons, including but not limited to, the following readily apparent facts:

(a)     The letter is written in English and not in Greek, the language Greek businessmen use to communicate with each other.

(b)     The purported "letter from Cambis" to "Prof Kazantzis" inexplicably and nonsensically refers to each individual in the third person.

(c)     The purported letter nonsensically says several Iranian officials were arriving in Athens to "initiate and conclude a strategic agreement with FBB" on the same day the letter is dated and purportedly delivered to FBB.

(d)     The purported letter nonsensically goes on to say that these Iranian officials expected an appointment at FBB the very next morning to "invest in FBB by acquiring a substantial stake in the equity of the Bank."

(e)     Greek banks, including the former FBB, were (and still are) strictly regulated by both Greek and European regulators, and closely overseen and scrutinized by the International Monetary Fund ("IMF").

(f)     At the time the purported letter was supposedly sent to FBB explicitly to pursue an illegal business scheme with the Iranian regime, all Greek banks, including the former FBB, were (and still are) subject to multiple controls and detailed audits by Greek, European, and IMF officials, making receipt of the letter, the purported meeting, and any illegal

business arrangement impossible without detection and notification to multiple authorities.

(g)     The letterhead on which the purported letter is written demonstrates its lack of authenticity.  In fact, the watermark on the purported document has not been used by Athene Consulting House for a number of years and would not have appeared on genuine company letterhead in 2012.

(h)     The purported letter refers to the "Iranian Ministry of Oil," a nonexistent entity. Any businessman with purportedly long-standing connections to the Iranian Ministry of Petroleum would know the organization and refer to it by its correct name.

(i)     Under regulations and procedures applicable to all Greek banks, including the former FBB, all incoming mail and correspondence is, and was, carefully monitored.  All correspondence received by a Greek bank, including correspondence such as the purported Cambis letter supposedly delivered to FBB, is methodically numbered and recorded. The purported Cambis letter, in fact, was never delivered to FBB, numbered or recorded.

66.     The purported "proposed consultancy agreement" from Concept Consulting Ltd. to Mr. Restis is a fraudulent and patently unreliable source for multiple reasons, including the following readily apparent facts:

(a)     The purported agreement is unsigned, incomplete, and apparently unfinished.

(b)     The purported agreement letter is written in English and not in Greek, the language Greek businessmen use to communicate with each other.

(c)     As Defendants admittedly are aware, Concept Consulting Ltd. appears not to exist, a red flag indicating that the purported proposed agreement is nonsensical and fraudulent.

(d)     The purported proposed agreement does not, as a matter of law, constitute an "agreement," as Defendant Wallace, an attorney, should most certainly be aware. Further, the provisions of the purported proposed agreement are nonsensical, including without limitation, the termination provision which states that "[i]n the event of termination by you or us of our engagement, paragraphs 3, 4, 5, 6, 7, 8, 9, 10 and 11, continue to apply after such termination." Yet, the purported proposed agreement contains no provisions 9 through 11, and provision 8 is the termination provision itself.

67.     Due to the strict regulatory and procedural controls over all Greek banks, it is beyond question that FBB has had no illicit business arrangement, financial transaction or business scheme of any kind with Cambis, his company, or any other person associated with Iran. To the contrary, throughout all of its years of operation through the date it was acquired by the National Bank of Greece, FBB never had any involvement with nor did it ever transaction with Iran. It never received any capital, investments or financing from the Iranian government, nor has it ever issued any loans, maintained accounts, or transferred or handled money on behalf of Iranian companies or individuals or any companies or individuals subject to international sanctions.

68.     Defendants knew and/or recklessly disregarded the fact that any independent Greek bank in financial distress, including the former FBB, being acquired by the National Bank of Greece, is subjected to intensive scrutiny, including detailed examinations and thorough audits of its transactions and business dealings, prior to completing the acquisition. In fact, the Defendants knew and/or recklessly disregarded the fact that the National Bank of Greece's acquisition of FBB was publicly announced on May 11, 2013 – two days before Defendants launched their false campaign of defamation and disparagement against Mr. Restis, FBB and EST.

69.     Naturally, well in advance of the acquisition in May 2013, FBB had been subjected to thorough audits by a Special Task Force of Auditors of the Department of Supervision of Credit and Financial Institutions of the National Bank of Greece, including meticulous audits of: (a) its entire portfolio; (b) its own Internal Audit Systems; (c) its IT systems for the effective prevention and combating of money laundering and financing of terrorism, and (d) the accuracy of the data submitted by FBB, particularly with respect to cross border monetary transfers. Over the course of almost two years of audits, this Special Task Force did not find any evidence of any transaction whatsoever between FBB and the Iranian government or any persons or entities affiliated with Iran.

70.     Further, when the National Bank of Greece's acquired FBB, all assets of FBB, including all accounts, and all obligations with respect to deposits were transferred to the National Bank of Greece. Thus, as Defendants are aware, any purported transfer of funds from the Iranian regime or Iranian MoP to FBB would immediately have been discovered by the National Bank of Greece. Obviously, no transactions of the kind concocted by Defendants were ever identified by the National Bank of Greece or the team of experienced auditors it engaged.

The May 11, 2013 announcement – two days before Defendants launched their reputation destruction campaign against Mr. Restis and his companies – confirming that the National Bank of Greece acquired FBB completely refutes Defendants' false, outrageous, and frankly, ridiculous, assertions that Mr. Restis and FBB received letters "confirming" a nefarious meeting to consummate an illegal business scheme with the Iranian regime, which Defendants have falsely and repeatedly stated included monthly transactions directed to FBB by these Iranian partners to the tune of "a few billions" flowing through the bank.

71.     Defendants knew and/or recklessly disregarded the obvious fact that neither FBB nor Mr. Restis had a meeting with Sir Kazem Vaziri, Mr. Homayoun Ansari and Dr. M.Ali Izadi, the purported Iranian officials visiting Greece, nor did Mr. Restis or FBB engage in any illegal business arrangement with the Iranian regime, because such illegal and illicit activities could not have escaped detection and notification to multiple authorities, nor could they have escaped the thorough scrutiny of the National Bank of Greece.

72.     Likewise, there is no factual basis for Defendants' false direct and implied assertions that EST, the flagship of the Restis family shipping businesses, is "being used to aid Iran in its evasion of international sanctions" and "to illegally transport [Iranian] oil in a concerted effort to evade U.S., EU, and international sanctions."

73.     In fact, according to UANI's website, "UANI's MINERVA system monitors and polices Iranian shipping activities in real-time 24 hours a day.  UANI MINERVA analysts in New York, London and Hong Kong, provide around-the-clock monitoring of the Iranian commercial fleet in order to detect, analyze and bring to light nefarious Iranian shipping activities as they occur, and notify relevant authorities of illicit actions occurring in their jurisdictions."  Further, "MINERVA collects and processes raw vessel data including speed,

heading, identity, draught and destination information.  MINERVA then correlates this shipping data with supplementary data from maritime industry sources and employs algorithmic analysis to create distinct vessel and shipping route profiles and predict the future course and destination of otherwise undetectable dark and/or spoofing vessels of the Iranian regime."

74.     Contrary to Defendants' false assertions, and as Defendants know from the detailed and sophisticated information concerning nefarious and illegal Iranian shipping activities collected by UANI 24 hours a day, EST, in fact, is <u>not</u> aiding Iran by illegally transporting its oil, and no EST-managed ships have ever operated routes to and/or from Iran in violation of international sanctions.  Defendants are well aware that enormous oil tankers cannot hide their whereabouts without detection.   Defendants have never cited a shred of data to substantiate their false and defamatory assertions because there is no such data.

### Defendants Acted With Actual Malice

75.     Plaintiffs are informed and believe that Defendants carefully selected and employed highly offensive and sensational words and images for the singular purpose of garnering global attention to their ongoing campaign maliciously misinforming, misleading and alarming the public, business community, regulatory and governmental authorities, and media worldwide, to wrongly believe that Plaintiffs are criminals in league with the Iranian regime who are aiding and abetting a nuclear Iran.

76.     A review of the UANI Publications, content and information, as alleged above, clearly and convincingly demonstrates that Defendants have irresponsibly conducted their "name and shame" global campaign of defamation and disparagement, falsely demonizing Plaintiffs as "front-men" engaged in "illicit," "unethical," and "indeed illegal" business

"schemes" with the Iranian regime, with knowledge of falsity and in reckless disregard for the truth and facts.   Defendants' actual malice is evidenced, among other things, by:

(a)    Despite the highly offensive, inflammatory and extremely damaging nature of their criminal accusation to be published globally, Defendants failed to contact Mr. Restis prior to the publication of their defamatory *per se* assertions, and thereby affirmatively denied him any opportunity to correct, refute or clarify false assertions and accusations;

(b)    Defendants blatantly and mischaracterized the purported documents, which in no way "confirm" or "corroborate" their false accusations of criminal conduct;

(c)    Defendants relied on patently fraudulent and unreliable sources to prop up their false and defamatory campaign.

(d)    Defendants concealed from the public review and scrutiny the two documents that are cited as corroboration of their false accusations.

(e)    Defendants failed to seek out other and more reliable, authoritative and credible sources, including, as one example, Mr. Restis, the target of their reputation destruction campaign.

(f)    Defendants were aware of the probable falsity of their assertions;

(g)    Defendants recklessly disregarded the probability of questionable "facts" they asserted and relied upon in their false publications;

(h)    Defendants failed to act reasonably to dispel obvious doubts about the accuracy of their false assertions;

(i)    Defendants' purposefully avoided the truth prior to launching their campaign of defamation and disparagement and thereafter;

(j)     Defendants have defiantly refused to acknowledge their wrongful conduct, retract

and remove their publications, or apologize to Mr. Restis.

(k)     Defendants have defiantly refused to mitigate the grave and irreparable harm, and

extreme emotional distress that they have intentionally inflicted upon Mr. Restis,

his family and his businesses worldwide.

77.     In immediate response to the highly damaging and defamatory *per se*

statements disseminated by Defendants worldwide, on or about May 14, 2013, Mr. Restis

publicly released a statement exposing the falsity and recklessness of Defendants' allegations.

According to the statement, which was carried in news reports that, upon information and belief,

were read by Defendants,

> *Mr Victor Restis, in his personal capacity and as shareholder of Enterprises Shipping & Trading, and all affiliated companies, unequivocally and categorically refutes any involvement, arrangement or transaction of any kind whatsoever between him and any of his affiliated companies with Mr Dimitris Cambis or any of the companies or entities Mr Cambis represents.*
>
> *Mr Restis refutes with the same emphasis and sentiment denies any involvement, arrangement or transaction with any other sanctioned entity including the National Iranian Oil Company and/or National Iranian Tanker Company.*
>
> *Mr Restis rejects any arbitrarily manufactured 'indications' that insinuate the opposite. Mr Restis reserves his rights to defend his own and his affiliated companies' ethics, reputation and integrity.*

78.     On May 15, 2013, the Head of Compliance for FBB, George

Papastathopoulos, sent Defendant Wallace a letter in which FBB made clear to Wallace that FBB

never received any letter from Cambis, and if it had, it would have immediately notified the

National Bank of Greece through its Compliance Department.  FBB further informed Wallace

that neither Cambis nor any of his companies were clients of FBB, and it "clearly state[d] that

FBB has never had any dealings whatsoever with the Iranian Minister of Petroleum and NIOC and NITC."

79.     Additionally, on May 16, 2013, counsel for Mr. Restis sent Defendants a letter, directed to defendant Wallace, informing Defendants that "the basis of [their] allegations are false and fraudulent and were either given to [Defendants] by persons seeking harm to Mr. Restis in his business or were wrongfully used by [Defendants] to harm Mr. Restis." In no uncertain terms, this letter informed Defendants that "Mr. Restis does not do business with Iran nor does he sanctions others who do."

80.     Despite repeatedly being put on notice that their accusations are demonstrably false and wrongly based on patently fraudulent and unreliable sources of so-called "corroborating" documents, on May 17, 2013, Mr. Wallace sent another letter to counsel for Mr. Restis, demanding that Mr. Restis "make a sworn statement under United States law that fully describes any and all work performed by you or through your affiliates in Iran," and "commit to a full and transparent survey of [his] business undertakings to confirm [his] statement." This letter further threatened that to "seek [Mr. Restis'] designation under appropriate U.S. law, including the United and Strengthening America by providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act")."

81.     Defendants continued to disseminate their defamatory *per se* accusations defaming and causing irreparable harm to Mr. Restis and his companies.

82.     On June 24, 2013, Mr. Wallace sent another letter to counsel for Mr. Restis, in which he again demanded that Mr. Restis submit to an "independent, external review and audit of [his] business activities," and "offered" to provide options of lawyers with "law

enforcement experience" to conduct this "review and audit."  Defendants' defiantly carried on their false and defamatory "name and shame" campaign.

83.     On or about July 3, 2013, counsel for Mr. Restis sent Mr. Wallace a detailed letter, *again* placing Defendants on notice of their demonstrably false, highly offensive, extremely serious, and defamatory *per se* campaign repeatedly stating that Mr. Restis, FBB and EST are engaged in illegal business schemes with the Iranian regime.  The July 3 letter requested that Defendants promptly take all appropriate and necessary remedial measures to rectify the grave and irreparable reputational, emotional and economic harm that their false campaign of defamation and disparagement wrongly inflicted upon Plaintiffs, including the immediate removal of the UANI Publications from UANI's website.  (A true and correct copy of the July 3, 2013 Cease and Desist Letter is attached as **Exhibit I**).  In addition, this letter requested that Defendants promptly issue on UANI letterhead over Mr. Wallace's signature, the following retraction and apology:

### *Retraction and Apology of Mark D. Wallace on UANI Letterhead*

*It has come to my attention and the attention of the leadership of United Against Nuclear Iran that my May 13, 2013 open letter to Victor Restis, personally signed by me and published globally by UANI on May 13, 2013, and thereafter, contains inaccurate and very serious misinformation wrongly stating that Mr. Restis and the Restis Group businesses, including the former First Business Bank and Enterprise Shipping and Trading S.A, are engaged in illegal business schemes with the Iranian regime, when, in fact, this is not the case.  My letter and my inaccurate charges of criminal activities aiding and abetting Iran were wrongly based on two unsubstantiated and unauthenticated documents from unidentified, unreliable and biased sources.*

*The inaccurate information published in my letter, and republished in UANI's related press releases, postings and Call to Action, was improperly sent to numerous government and regulatory officials worldwide, and continuously posted on UANI's website ,www.uani.com.*

*With the full support of UANI's leadership, I hereby retract my letter and all related UANI publications that have inaccurately and wrongly stated or*

*suggested that Mr. Restis, First Business Bank, Enterprise Shipping and Trading S.A. and other entities affiliated with Mr. Restis were engaged in illegal business schemes with Dimitris Cambis, the Iranian regime, the Iranian Ministry of Petroleum, and the National Iranian Tanker Company, in violation of sanctions against Iran.*

*To be clear, contrary to the inaccurate information in my May 13 letter and UANI's related publications, in fact, Mr. Restis and the Restis Group Entities are not engaged in any illegal business schemes, and there was, and is, no factual basis for me and UANI to say or suggest that Mr. Restis was involved in such nefarious activities.*

*On behalf of UANI, its leadership, and its many supporters, we deeply regret these serious errors and I personally extend to Mr. Restis and the Restis family my sincere apology for wrongfully publishing inaccurate information that was deeply offensive and hurtful to them.*

84. In response to the July 3, 2013 letter, Defendants again defiantly refused to stop their malicious defamatory attack on Mr. Restis. Defendants' strident and indefensible position is even more striking in view of the fact that Mr. Wallace concedes that Mr. Restis is not currently doing business in Iran, if he ever was.

85. As further evidence of Defendants' actual malice, Mr. Wallace responded to the July 3, 2013 Cease and Desist letter with a July 15, 2013 email transmitting the text of a brand new press release that Defendants simultaneously posted on their website underneath the graphic of six linked hands surrounding Iran. Under the title, *"UANI Issues Statement Regarding Greek Ship Owner Victor Restis; UANI Calls for U.S. Investigation and for Restis to be Barred from U.S. Business,"* the press release relayed a statement from Defendant Wallace, which stated, in part:

UANI first contacted Victor Restis in May regarding our serious concerns related to documents and statements that purport to show business dealings by and between Mr. Restis and related companies with the sanction-designated Greek businessman Dimitris Cambis and Iran. Mr. Restis has responded to that contact in May with baseless, bizarre, and defamatory accusations against UANI. The wild and groundless statements Mr. Restis made about UANI call Mr. Restis' credibility into question.

86.    The new press release claims that Defendants have given Mr. Restis "every reasonable opportunity to collaboratively and transparently resolve this matter" by demanding from Mr. Restis "a sworn statement refuting involvement in Iran-related dealings" and "a transparent survey of his relevant business." Rather than responding to these "reasonable proposals," Defendant Wallace's statement claims that "Mr. Restis has resorted to the bullying tactics of a billionaire's hubris – defaming and threatening a not-for-profit entity whose sole agenda is to ensure that Iran does not achieve its goal of possessing a nuclear weapon.  His tactics amount to a threat to use his vast financial resources to bankrupt UANI and its leadership unless UANI reveals its (highly credible) confidential sources, recants its public concerns regarding Mr. Restis, and makes a groundless apology."

87.    Defendant Wallace's statement blithely dismisses the July 3, 2013 Cease and Desist letter with the back of the hand, and complains that ""the letter is quite lengthy, and UANI remains concerned that its length masks a lack of substantive explanation and its length is mostly a repetition of UANI letters."  In fact, it is readily apparent that the letter provides a substantive identification and refutation of the false content in Defendants' publications, as well as the overwhelming evidence of Defendants' actual malice.

88.    Despite all of the information, facts, and notice available to Defendants, they still refuse to remove and retract their false, highly offensive, and defamatory *per se* Publications, they refuse to publish a retraction, they refuse to apologize to Mr. Restis and his family, they refuse to notify other media outlets and publications that have published reports or republished UANI's false and defamatory accusations to alert them about the inaccurate and disparaging content, and they have refuse to take remedial action to mitigate the grievous and irreparable harm they have inflicted on Mr. Restis, the Restis family, and the family businesses.

### Mr. Restis And Restis Family Businesses Have Suffered
### Severe Reputational Harm, Extraordinary Economic Damages,
### And Mr. Restis Has Been Subjected To Severe Emotional Distress

89.     As intended, Defendants' widespread and continued dissemination of its "name and shame" reputational destruction campaign against Mr. Restis has caused and continues to cause massive, ever-mounting and irreparable damages, including economic and business losses caused by Defendants' intentional and negligent interference with extremely valuable existing contractual relationships, as well economic and businesses losses caused by Defendants intentional and negligent interference with significant prospective economic benefits and/or opportunities.

90.     EST is the flagship of the Restis shipping companies, and the commercial value of its fleet is an estimated $2.3 billion or more.  The Restis shipping businesses operate more than seven hundred shipping routes annually, with agencies in at least four separate countries.  As a result, EST transacts with financial institutions all over the world, with a total estimated transaction volume of many billions of Euro per year.

91.     Although the bulk of its assets have been acquired by the National Bank of Greece, Plaintiff FBB continues to conduct business with its remaining assets.  As a direct result of Defendants' false campaign of defamation and disparagement, Plaintiffs EST and FBB have now been placed on a "blacklist" of companies that purportedly engage in transactions with Iranian interest.  Since the dissemination of Defendants' false, highly damaging, and defamatory *per se* publications, the financial institutions with which Plaintiffs conduct business and on which Plaintiffs rely to carry out their day-to-day operation refuse to handle even the slightest financial transaction unless and until they receive an official declaration that it does not transact with Iran.  As an example, even a simple request to a financial institution to execute payroll of Restis company employees through a bank transfer was met with the extreme response that the

financial institution was unable to execute the transaction without first receiving a signed declaration from Mr. Restis or an appropriate company representative swearing under oath that they have not transacted with Iran.

92.     In addition to the apparent reputational harm inflicted on Mr. Restis and his companies with respect to these financial institutions, these wholly unwarranted and unnecessary procedural delays and hurdles have severely and adversely impacted daily operations and business.

93.     Defendants' ongoing global campaign irresponsibly and wrongly asserting that Plaintiffs are engaged in illegal activities to facilitate a nuclear Iran has inflicted significant and irreparable harm not only on Mr. Restis, FBB and EST, but also on numerous companies owned by and/or affiliated with Mr. Restis and his family.  As a direct result of Defendants' publication of the false, highly damaging, and defamatory *per se* statements accusing Mr. Restis and his companies of being "front-men" for the Iranian regime, numerous business transactions, which had been preceded by months of negotiation and were in the final stages of negotiation and execution, were delayed, frustrated, and in many instances, terminated in their entirety.

94.     As intended, Defendants' launched their false and defamatory "name and shame" reputation destruction campaign on May 13, 2013, Defendants effectively destroyed – in a single day – transactions built on months of negotiation and the investment of millions of dollars.  While Defendants' unabated and unmitigated false and defamatory campaign continues to cause more damage each passing day, Defendants already have inflicted economic, reputational, and emotional damages to Mr. Restis and Restis family businesses in excess of $3 billion.

95.     As a prime example of the damages caused by Defendants' conduct, Mr. Restis owns and manages a shipping company, Golden Energy Marine Corp. ("Golden Energy"), which is the parent company of four shipping companies, Golden Energy Management, S.A., Petronaft, S.A., Emaroil Co., and Sodinave Ltd., that together manage more than twenty (20) ships.  Over the past year, Golden Energy began the process of listing its stock for trading on the New York Stock Exchange by submitting its shares to an Initial Public Offering ("IPO"), with the goal of obtaining liquidity from the capital market in the United States, where it has been active for a number of years.

96.     IPOs generally involve one or more investment banks known as "underwriters," with which the company offering its shares (or the "issuer") enters into a contract to sell its shares to the public.  Underwriters provide services with respect to the valuation of the shares to be offered, and establishing a public market for shares.  The underwriter also drafts and signs the prospectus, a document setting forth all information relating to the issuer and the securities that are the subject of the offer, which is necessary for investors to assess the structure, operations, financial condition and prospects of the issuer.

97.     Prior to Defendants' publication of their false and defamatory *per se* "name and shame" campaign against Mr. Restis, Golden Energy had been approved by the NYSE to sell its shares through an IPO, and it had entered into a contract with underwriters JP Morgan and Deutsche Bank in connection with the IPO.  The IPO process had proceeded without any disruption, was in its final stage, and only days away from the listing of Golden Energy's shares on the NYSE.

98.     In the wake of Defendants' scurrilous and defamatory publications and widespread dissemination of the false and highly alarming accusations that Mr. Restis is a "front-

man" for the Iranian regime, on or about May 25, 2013, the underwriters, JP Morgan and Deutsche Bank issued notices of withdrawal from the IPO of Golden Energy.  As a result of Defendants' campaign and conduct, Mr. Restis was forced to cancel the IPO indefinitely. Defendants' false and malicious campaign irreparably damaged and destroyed the reputation of Golden Energy in the eyes of potential investors and regulators and, as a result, the price of the shares Golden Energy expected to achieve through the IPO.  The only reason for the withdrawal of the underwriters and the cancellation of the IPO was Defendants' false, baseless and highly alarming accusations that Mr. Restis a "front-man" for the Iranian regime and engaged in illegal business schemes for profit and in violation of sanctions rules

99.    Had Defendants intentional and tortious conduct not torpedoed the IPO, Golden Energy would have raised an estimated $1.01 billion in new equity, with a total estimated implied equity value to Mr. Restis of approximately $720 million.  Thus, given Mr. Restis' role as owner and manager of Golden Energy, Mr. Restis has suffered severe, sustained and irreparable reputational, economic, and emotional damages.

100.    As another example of damages caused by Defendants' campaign of defamation and disparagement, Mr. Restis, through his company RX-Drill Energy Cyprus Ltd. ("RX-Drill"), was in constant and well-developed negotiations with the government of Cyprus to apply for and purchase underwater mining rights for gas and other hydrocarbons.  These rights would extend for 35 years and are worth approximately $100 million per year.  The negotiations for this application and purchase were complete, and all that remained was the formal acceptance by the Cyprus government of RX-Drill's application.  Indeed, Mr. Restis had expended millions of Euros on mining-related equipment in anticipation of this relationship.  However, on May 24, 2013, in the wake of Defendants' false and defamatory publications and its worldwide

dissemination of false and defamatory *per se* accusations that Mr. Restis is a "front man" for the Iranian regime engaged in "illegal" business schemes for profit, the Cyprus government rejected RX-Drill's application.

101.   State officials and legal advisors of the Cyprus government confirmed that the only reason for government's termination of this agreement was the defamatory statements disseminated by Defendants.   Specifically, Plaintiffs were told that the Cyprus government would not conduct business with Mr. Restis and his companies because it feared the criticism and accusations it would face for cooperating with a "conspirator" and a "financier of international terrorism."   Defendants' conduct interfering with and extinguishing this economically advantageous business deal has resulted in lost profits for the term of the lease agreement of approximately $1 billion, as well as additional reputational and emotional damages to Mr. Restis in an amount to be proven at trial.

102.   In addition to the foregoing damages and losses, Mr. Restis and his companies have suffered other severely adverse business losses and economic damages due to Defendants' campaign of defamation and disparagement, and have caused severe reputational, and emotional damage to Mr. Restis and Restis family companies in an amount to be proven at trial.

**DEFENDANTS' CONDUCT WARRANTS PUNITIVE DAMAGES**

103.   Defendants' conduct warrants the imposition of punitive damages.   The factors justifying punitive damages include, at a minimum, but are not limited to, the following:

(a)   Despite the highly offensive, inflammatory and extremely damaging nature of their criminal accusation to be published globally, Defendants failed to contact Mr. Restis prior to the publication of their defamatory *per se* assertions,

and thereby affirmatively denied him any opportunity to correct, refute or clarify false assertions and accusations;

(b)     Defendants blatantly and mischaracterized the purported documents, which in no way "confirm" or "corroborate" their false accusations of criminal conduct;

(c)     Defendants relied on patently fraudulent and unreliable sources to prop up their false and defamatory campaign.

(d)     Defendants concealed from the public review and scrutiny the two documents that are cited as corroboration of their false accusations.

(e)     Defendants failed to seek out other and more reliable, authoritative and credible sources, including, as one example, Mr. Restis, the target of their reputation destruction campaign.

(f)     Defendants were aware of the probable falsity of their assertions;

(g)     Defendants recklessly disregarded the probability of questionable "facts" they asserted and relied upon in their false publications;

(h)     Defendants failed to act reasonably to dispel obvious doubts about the accuracy of their false assertions;

(i)     Defendants' purposefully avoided the truth prior to launching their campaign of defamation and disparagement and thereafter;

(j)     Defendants have defiantly refused to acknowledge their wrongful conduct, retract and remove their publications, or apologize to Mr. Restis.

(k)      Defendants have defiantly refused to mitigate the grave and irreparable

harm, and extreme emotional distress that they have intentionally inflicted upon

Mr. Restis, his family and his businesses worldwide.

## COUNT I:
## DEFAMATION
### (Against All Defendants)

104.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1

through 102 above and incorporate them by reference as fully set forth herein.

105.    Defendants have published and continue to publish to the general public,

the media and prominent Members of Congress, representatives of the Obama Administration,

and officials in the Greek government, the false, highly inflammatory, defamatory *per se*, and

highly damaging message, through Defendants' global dissemination of their publications, that

Mr. Restis, FBB and EST are "front-men" for the Iranian regime, and are engaging in an illegal,

illicit and immoral conspiracy to violate international sanctions against Iran, and are providing

support to the Iranian regime in violation of international sanctions, as set forth in the content

and words identified in Paragraphs 35 through 60 above.

106.    These demonstrably false and misleading assertions of fact are

unprivileged, and they were and continue to be widely communicated from the State of New

York throughout the United States and internationally through Defendants' "name and shame"

campaign against Mr. Restis, FBB and EST.

107.    These demonstrably false and defamatory assertions of fact constitute

defamation under New York common law.

108.    Defendants knew and/or recklessly disregarded the fact that the

documents materially mischaracterized by and purportedly relied upon by Defendants for

"confirmation" and "corroboration" that the false and defamatory assertions in Defendants' publications, were patently fraudulent and unreliable sources, and in any event, utterly failed to support the false and defamatory assertion that Defendants were conspiring with individuals acting on behalf the Iranian Regime to serve as a front for or otherwise engaging in unlawful or illegal activities for or with the Iranian Regime.

109.   Thus, in publishing and communicating these false and defamatory statements and in refusing to retract them, Defendants acted intentionally and with malice. Despite the fact that the false and defamatory statements were entirely unsupported, and facts and information refuting these false and defamatory statements were readily available to Defendants prior to production, Defendants nonetheless published and continue to publish the false and defamatory statements regarding Plaintiffs' purported involvement with the Iranian regime in violation of international sanctions.  Furthermore, Defendants have refused to remove the Defamatory Publications from the UANI website, they have refused to publish any retraction or apology, and they have refused to notify media outlets or publications that have published reports based on the false and defamatory Publications to alert them of the inaccurate and disparaging content published by Defendants.  Nor have they taken any corrective action to mitigate the grievous harm caused by Defendants to Plaintiffs despite Plaintiffs repeated demands.

110.   The false and defamatory UANI Publications have severely and irreparably injured Mr. Restis and the Restis family businesses, by falsely claiming that they are "front-men" for the Iranian regime, who are engaged in improper, unethical and illegal business practices and criminal activity.  The false and defamatory UANI Publications have damaged Mr. Restis' personal reputation and the Restis family businesses' reputations.  Mr. Restis and his

companies have suffered significant reputational injuries among key business customers and partners, investors, consultants, and others who have heard or seen the Defendants' false and defamatory publications.

111.   As a direct and proximate result of Defendants' actions, and as alleged in detail above, Plaintiffs have and will continue to suffer a diminution in personal and business reputation and goodwill, lost business opportunities, lost profits, and other economic, reputational, and emotional damages in an amount to be proven at trial, but in an amount in excess of this Court's threshold for jurisdiction.

112.   In addition, if Defendants are not enjoined from further publication of these false and disparaging statements regarding Plaintiffs' purported affiliation with and support of the Iranian regime, Plaintiffs will suffer irreparable harm in the form of significant damages to their personal and business reputations and goodwill.   Further, as alleged above, UANI admittedly provides information to the public regarding purported affiliations with Iran in order to serve as a "resource for individuals to make informed purchasing, investment and divestment decisions," and it claims the information it provides is "widely by the media, professional researchers and academics, elected officials and policy makers."   Defendants' sensational campaign of defamation and disparagement against Mr. Restis, his family and their companies has caused and will continue to cause unwanted fear and confusion among viewers of UANI's website, the media, governmental, banking, regulatory and other authorities, communities in which Mr. Restis lives, socializes, works and conducts business, and individuals and entities in the United States and around the world, with whom Plaintiffs have existing and prospective business relationships.   Thus, the issuance of injunctive relief will serve to promote public interest.  The facts set forth above demonstrate that Plaintiffs have no adequate remedy at law,

and the irreparable harm Plaintiffs will suffer absent the issuance of injunctive relief far outweighs any harm Defendants will suffer if an injunction is granted.

## COUNT II:
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against All Defendants)

113.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 111 above and incorporate them by reference as fully set forth herein.

114.    By virtue of their impeccable business reputations, substantial goodwill and success, Mr. Restis and the Restis family companies enjoyed numerous prospective economic advantages, relationships and contracts with various third parties, including without limitation, the prospective economic advantage anticipated from the impending IPO of Golden Energy and a mining rights agreement with the government of Cyprus.

115.    Given the high profile and media coverage of Plaintiffs and their business activities and relations, Defendants were aware of these relationships at all relevant times, and the significant potential economic advantage that they would provide Plaintiff.

116.    Defendants engaged in an improper and unlawful campaign of defamation and disparagement, as alleged in detail above, that was with malice and/or in reckless disregard for the truth, and that was designed to interfere with Plaintiffs' business relations and prospective economic advantage.

117.    As a direct and proximate result of Defendants' actions, these prospective relationships, contracts and business advantages did not form and/or occur, including without limitation, Plaintiffs were forced to cancel the Golden Energy IPO, and the Cyprus government terminated its relationship with Plaintiffs.  Plaintiffs would have realized a significant economic advantage from these relationships and/or contracts but for Defendants' intentional interference.

As a result of Defendants' conduct, Plaintiffs have lost and continue to lose substantial revenue and profit.

118.   As a direct and proximate result of Defendants' actions, Plaintiffs have been damaged and will continue to be damaged in an amount to be established at trial, but in an amount to exceed $3 billion.  These damages include, without limitation, lost profits, fees and expenses associated with lost third party contracts and/or other economic opportunities and advantages including, among others, the impending IPO of Golden Energy and the mining rights agreement with the government of Cyprus.

119.   Because the conduct of Defendants was intentional, wanton and in reckless disregard of Plaintiffs' rights, as alleged in detail above, Plaintiffs are entitled to an award of punitive damages.

## COUNT III:
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against All Defendants)

120.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 118 above and incorporate them by reference as though fully set forth herein.

121.   Given the high profile and media coverage of Plaintiffs and their business activities and relations, Defendants were aware of valid and existing contracts between Plaintiffs and third parties at all relevant times, including without limitation, contracts with various financial institutions, underwriters involved in the IPO of Golden Energy and the government of Cyprus.

122.   Defendants engaged in an improper and unlawful campaign of defamation and disparagement, as alleged in detail above, that was with malice and/or in reckless disregard

for the truth, and that was designed to interfere with Plaintiffs' contracts with these third parties and to induce a breach of these contracts by the third parties.

123.   As a direct and proximate result of Defendants' actions, Plaintiffs have been damaged and will continue to be damaged in an amount to be established at trial, but in an amount to exceed $3 billion.  Plaintiffs would have realized a significant economic advantage from these contracts but for Defendants' intentional interference.  As a result of Defendants' conduct, Plaintiffs have lost and continue to lose substantial revenue and profit.

124.   As a direct and proximate result of Defendants' actions, Plaintiffs have been damaged and will continue to be damaged in an amount to be established at trial.  These damages include, without limitation, lost profits, and fees and expenses associated with lost third party contracts, including, among others, the impending IPO of Golden Energy and the mining rights agreement with the government of Cyprus.

125.   Because the conduct of Defendants was intentional, wanton and in reckless disregard of Plaintiffs' rights, as alleged in detail above, Plaintiffs are entitled to an award of punitive damages.

## COUNT IV:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (By Victor Restis Against All Defendants)

126.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 123 above and incorporate them by reference as fully set forth herein.

127.   The Defendants' ongoing deliberate and malicious "name and shame" campaign of false and defamatory statements regarding the Mr. Restis was with knowledge that the statements were untrue and for the singular purpose of harassing and intimidating Mr. Restis.

128.   The statements were directed specifically at Mr. Restis with an intent to cause, or in disregard of a substantial probability of causing, severe emotional distress to Mr. Restis.   These statements had their desired effect, resulting in demoralization and social ostracism, and causing Mr. Restis severe mental pain that has impacted his daily functions and is of such a substantial and enduring quality that no reasonable individual in civilized society should be expected to endure it.   Given that virtually all members of his mother's family were killed at Auschwitz during the Holocaust, Mr. Restis clearly understands the critical importance of a Jewish State and is deeply committed to Israel's security.   The mental anguish suffered by Mr. Restis as a result of Defendants' relentless and widespread harassment and intimidation is compounded by the fact that Defendants are communicating to the world that Mr. Restis is supporting a government that has openly called for the destruction of the state of Israel.

129.   Furthermore, Defendants intentionally used highly sensationalized and inflammatory graphics and headlines to spread the false message that Mr. Restis is engaged in illicit business with the Iranian regime, in conjunction with repeated demands that the public "TAKE ACTION!" against Mr. Restis, further compounding the severe mental anguish suffered by Mr. Restis as a result of Defendants campaign of intimidation and harassment.   This is particularly so given the vulgar and/or threatening public responses to Defendants' false and highly damaging publications against Mr. Restis many of which have encouraged violence against Mr. Restis.

130.   By accusing Mr. Restis of being a "front-man" for Iran, Defendants intended to make him a pariah in the Jewish community, the business community, and among government officials and in the eyes of the public around the world.   Defendants specifically

sought to destroy Mr. Restis' reputation and those of his companies. Defendants' acts were extreme and outrageous, and they have no place in a democratic and civilized society.

131.    As a direct and proximate result of Defendants' actions, Plaintiffs have been damaged and will continue to be damaged in an amount to be established at trial, but in an amount to exceed $3 billion.

132.    Because the conduct of Defendants was intentional, wanton and in reckless disregard of Plaintiffs' rights, as alleged in detail above, Plaintiffs are entitled to an award of punitive damages.

## COUNT V:
## NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against All Defendants)

133.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 131 above and incorporate them by reference as fully set forth herein.

134.    By virtue of their impeccable business reputations, substantial goodwill and success, Plaintiffs enjoyed numerous prospective economic advantages, relationships and contracts with various third parties, including without limitation, the prospective economic advantage anticipated from the impending IPO of Golden Energy and a mining rights agreement with the government of Cyprus. These future economic relationships would have provided Plaintiffs with substantial revenues and profits.

135.    Given the high profile and media coverage of Plaintiffs and their business activities and relations, Defendants were aware of these relationships at all relevant times, and the significant potential economic advantage that they would provide Plaintiff.

136.    Defendants knew or should have known that their improper and unlawful campaign of defamation and disparagement, as alleged in detail above, would interfere with these relationships and with Plaintiffs' prospective economic advantage.

137.    As a direct and proximate result of Defendants' actions, these prospective relationships, contracts and business advantages did not form and/or occur, including without limitation, Plaintiffs were forced to cancel the Golden Energy IPO, and the Cyprus government terminated its relationship with Plaintiffs.  Plaintiffs would have realized a significant economic advantage from these relationships and/or contracts but for Defendants' intentional interference.  As a result of Defendants' conduct, Plaintiffs have lost and continue to lose substantial revenue and profit.

138.    As a direct and proximate result of Defendants' actions, Plaintiffs have been damaged and will continue to be damaged in an amount to be established at trial, but in an amount to exceed $3 billion.  These damages include, without limitation, lost profits, fees and expenses associated with lost third party contracts and/or other economic opportunities and advantages, among others, the impending IPO of Golden Energy and the mining rights agreement with the government of Cyprus.

**COUNT VI:**
**PRIMA FACIE TORT**
**(Against All Defendants)**

139.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 137 above and incorporate them by reference as though fully set forth herein.

140.    Defendants' ongoing "name and shame" campaign of false, misleading and highly damaging statements regarding the Plaintiffs was done with the sole intent to harm Plaintiffs.  As alleged above, in disseminating false statements regarding Plaintiffs worldwide,

Defendants were singularly motivated by disinterested malevolence toward Plaintiffs in a targeted effort to harm Plaintiffs' reputation, interfere with and damage Plaintiffs' existing and prospective business relationships, and ostracize Plaintiffs among the community and government officials around the world.

141.   Defendants do not have, as alleged above, any excuse or justification whatsoever for the significant harm that they have intended to cause and have caused Plaintiffs through their widespread and relentless campaign of disparagement.

142.   As a direct and proximate result of Defendants' actions, Plaintiffs have been damaged and will continue to be damaged in an amount to be established at trial, but in an amount to exceed $3 billion.  These damages include, without limitation, damage to reputation, lost profits, fees and expenses associated with lost third party contracts and/or other economic opportunities and advantages, including the Golden Energy IPO and the agreement with the Cyprus government, both of which were terminated as a result of Defendants' actions.

## PUNITIVE DAMAGES

139.   Defendants' acts and omissions set forth above in this Complaint in paragraphs 1 through 138 above, incorporated as fully set forth herein, demonstrate actual and common law malice, egregious defamation, and insult.  Defendants' actions and omissions were undertaken with either (1) malice, spite, ill will, vengeance or deliberate intent to harm Mr. Restis and Restis family businesses; or (2) reckless disregard of the falsity of the content and the effects on Mr. Restis and the Restis family businesses.  Accordingly, Plaintiffs request an award of punitive damages and attorney's fees beyond and in excess of those damages necessary to compensate Plaintiffs for injuries resulting from Defendants' conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand the following relief:

1.      An order requiring Defendants to remove the defamatory publications from UANI's website and Facebook page, and anywhere else Defendants have published them;

2.      That judgment be entered against Defendants for compensatory damages, including economic and noneconomic damages, in an amount to be determined at trial;

3.      That judgment be entered against Defendants for punitive damages to punish Defendants' reprehensible conduct and to deter Defendants from repeating their unlawful conduct; in an amount to be determined at trial;

4.      Costs, fees and reasonable expenses incurred in the prosecution of this action;

5.      Prejudgment interest at the maximum legal rate on all sums awarded;

6.      Further relief as the Court may deem just and proper.

Dated: New York, New York
     July 19, 2013

By: _____

    Kerrie L. Campbell (*pro hac vice* pending)
    Michael Bhargava (*pro hac vice* pending)
    MANATT, PHELPS & PHILLIPS, LLP
    700 12th Street, N.W., Suite 1100
    Washington, D.C. 20005
    (202) 585-6500

    Erin C. Witkow (*pro hac vice* pending)
    MANATT, PHELPS & PHILLIPS, LLP
    11355 West Olympic Blvd.
    Los Angeles, California 90064
    (310) 312-4000

    Nirav Shah (Bar No: NS-6167)
    MANATT, PHELPS & PHILLIPS, LLP
    7 Times Square
    New York, New York 10036
    (212) 790-4500

    *Attorneys for Plaintiffs Victor Restis and*
    *Enterprises Shipping and Trading, S.A.*