UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------x
VICTOR RESTIS and ENTERPRISES SHIPPING AND    :
TRADING S.A.,                                  :
                                               :        OPINION AND ORDER
                        Plaintiffs,            :
                                               :         13 Civ. 5032 (ER)
            - against -                        :
                                               :
AMERICAN COALITION AGAINST NUCLEAR IRAN, :
INC. a/k/a UNITED AGAINST NUCLEAR IRAN,        :
MARK D. WALLACE, DAVID IBSEN, NATHAN           :
CARLETON, DANIEL ROTH, MARTIN HOUSE,           :
MATAN SHAMIR, MOLLY LUKASH, LARA PHAM,         :
and DOES 1-10,                                 :
                                               :
                        Defendants.            :
------------------------------------------------------------------x
```

Ramos, D.J.:

      This is a tort action concerning accusations that Victor Restis and Enterprises Shipping and Trading S.A. (collectively, "Plaintiffs") have engaged in prohibited business transactions in Iran.  Plaintiffs bring this action against American Coalition Against Nuclear Iran Inc., a/k/a United Against Nuclear Iran ("UANI"), Mark D. Wallace, David Ibsen, Nathan Carleton, Daniel Roth, Martin House, Matan Shamir, Molly Lukash, Lara Pham, and Does 1-10 (collectively, "Defendants"), alleging that as a result of UANI's "name and shame" campaign to destroy their reputations, Defendants are liable for defamation, tortious interference with prospective economic advantage, tortious interference with contract, intentional infliction of emotional distress, and *prima facie* tort.  Pending before the Court is Defendants' motion to dismiss the

Second Amended Complaint ("SAC").[1]  Doc. 25.  For the reasons discussed below, Defendants'

motion to dismiss is GRANTED in part and DENIED in part.

## I.    Background

Plaintiff Victor Restis, a citizen and resident of Greece, is a highly successful and

respected entrepreneur in the shipping industry.  SAC ¶ 23.[2]  Mr. Restis and his family are

among the largest and most successful ship owners in Greece, and their companies employ

thousands of individuals.  *Id.*  Plaintiff Enterprises Shipping and Trading S.A. ("EST") is one of

the world's largest independent off-shore shipping companies and the flagship of the Restis

shipping businesses.  *Id.* ¶ 24.  EST manages more than 80 ships and employs approximately

6,000 sailors worldwide, maintaining a fleet whose commercial value exceeds $2.5 billion.  *Id.*

Defendant UANI is a not-for-profit corporation that, according to its website, seeks to

prevent Iran from fulfilling its ambition of obtaining nuclear weapons.  *Id.* ¶ 25.  To that end,

UANI engages in private sanctions campaigns and legislative initiatives focused on ending

corporate support of the Iranian regime.  *Id.*  According to the SAC, although UANI advertises

itself as an American not-for-profit organization, it is in fact primarily funded by foreign

interests and governments whose interests and agendas are not disclosed to the public.  *Id.*

Plaintiffs have named various UANI officers and employees as defendants in the instant

action.  Defendant Mark D. Wallace, a co-founder and current CEO of UANI, is a former

---

[1] By companion Opinion and Order also issued today, the Court granted Plaintiffs' motion to amend the complaint a second time.  The Second Amended Complaint is thus the operative pleading.  While the briefing in the instant motion addressed the Amended Complaint (Doc. 34), the Second Amended Complaint adds additional and substantively similar facts, not causes of action or theories of recovery.  The SAC also adds five individual defendants.  For the reasons stated herein, the Court finds that the allegations against these defendants are sufficient at this stage of the litigation.

[2] For the purposes of the instant motion, the Court assumes the allegations in Plaintiffs' Second Amended Complaint to be true and relies exclusively on information contained therein.  *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).

representative of the Management and Reform Section of the U.S. Mission to the United

Nations.  *Id.* ¶ 26.  Defendant David Ibsen is the Executive Director of UANI.  *Id.* ¶ 27.  In that

capacity, Defendant Ibsen runs the day-to-day operations of UANI, and has been "integrally

involved" in UANI's "name and shame" campaigns.  *Id.*  Mr. Ibsen allegedly directed the

campaign against Plaintiffs, participated in drafting the defamatory publications, and coordinated

UANI staff in producing and distributing the publications.  *Id.*  Defendant Nathan Carleton, the

Communications Director for UANI, manages UANI's public communications and has similarly

been integrally involved in its "name and shame" campaigns, including that against Plaintiffs.

*Id.* ¶ 28.  Defendant Carleton helped draft the defamatory publications, distributed many of them

as press releases, and personally spoke with and emailed various reporters in order to

disseminate the defamatory allegations against Plaintiffs.  *Id.*

 Matan Shamir is UANI's Director of Research and Projects.  *Id.* ¶ 29.  According to

Defendant Shamir's LinkedIn profile, he directs research efforts on companies doing business

with Iran and manages UANI's social media campaign on Facebook, Twitter, and YouTube.  *Id.*

Defendant Shamir "directly contributed" to the creation and publication of the defamatory

publications, including by drafting versions of the publications, posting them on UANI's

website, and working with a third-party vendor to create graphics to accompany the publications.

*Id.*  Molly Lukash is UANI's Director of Social Media.  *Id.* ¶ 30.  Ms. Lukash participated in

"crafting" the defamatory allegations and worked with a digital media consulting firm in order to

prepare the allegations for publication.  *Id.*  She also drafted an "Action Alert" sent to UANI

readers which contains Defendants' defamatory allegations.  *Id.*

 Plaintiffs have also named the following individuals as defendants: Martin House, a

UANI Project Director; Lara Pham, UANI's Director of Operations; and Daniel Roth.  *Id.* ¶¶ 31-

33.[3]  According to Mr. House's LinkedIn profile, he has led campaigns that publicized major shipping sanctions frauds.  *Id.* ¶ 31.  Defendants House and Roth are alleged to have met with a reporter for a maritime industry publication on May 22, 2013 to further disseminate the defamatory allegations against Plaintiffs.  *Id.* ¶¶ 31, 33.  And according to Plaintiffs, both Ms. Pham and Mr. Roth helped draft the defamatory allegations against Plaintiffs and worked with other defendants to prepare them for final publication.  *Id.* ¶¶ 32, 33.

**UANI's Name and Shame Campaign Against Plaintiffs**

1.  *May 2013 Communications*

According to Plaintiffs, UANI launched a "Shipping Campaign" to target, *inter alia*, international cargo shippers in order to ensure that Iran's shipping and port sectors were isolated from international markets.  *Id.* ¶ 39.  In March 2013, UANI called on United States port authorities to deny docking privileges to any shipping company that continues to do business in Iran.  *Id.*  At the same time, UANI pressured international shipping companies to pull out of Iran.  *Id.*

On May 13, 2013, UANI sent a public letter to Mr. Restis in his capacity as the Chairman of First Business Bank ("FBB").  *Id.* ¶ 40.[4]  Plaintiffs allege that in the letter, Defendant Wallace defamed them by falsely alleging that they and FBB had illicit business dealings with sanctioned-designated individuals and Iranian oil and shipping entities.  *Id.*  The letter also accused Mr. Restis of engaging in a "significant and potentially lucrative illicit business relationship" with Greek businessman Dimitris Cambis to illegally export Iranian oil in violation

---

[3] The SAC does not indicate whether Roth is employed by UANI.

[4] FBB was previously a plaintiff in the instant action.  The Amended Complaint and SAC name only Mr. Restis and EST as Plaintiffs.  *See* Doc. 34.

of international sanctions.  *Id.*  Mr. Cambis was later sanctioned by the United States for

conspiring with the Iranian regime and Iran's Ministry of Petroleum ("MoP").  *Id.*

Plaintiffs allege that Defendants sent copies of the May 13, 2013 letter to at least 18 other

individuals, including senior Members of Congress, representatives of the Obama

Administration, and members of the Greek Government.  *Id.* ¶ 43.

According to Plaintiffs, UANI relied on two fraudulent and facially unreliable documents

as supposed confirmation of the allegations in the May 13, 2013 letter.  *Id.* ¶ 42.  First, Plaintiffs

allege that UANI relied on a letter dated April 25, 2012, purportedly from Mr. Cambis, which is

addressed to Professor Christos Kazantis, the CEO of FBB.  *Id.*  In that letter, Mr. Cambis

discussed the relationship between his company, Athene Consulting House, and the Iranian MoP,

and according to UANI, attempts to recruit Mr. Restis as a partner in Cambis' "illicit Iranian

investment scheme."  *Id.*  The second source for UANI's accusations is an "agreement letter"

dated April 25, 2012, purportedly from Concept Consulting Ltd., a Cypriot consulting company,

to Mr. Restis.  *Id.*  According to UANI, the agreement letter confirmed FBB's engagement of

Concept Consulting to attract "major international investors," including Iranian investors with

alleged ties to the MoP.  *Id.*

Plaintiffs state that UANI repeated the false accusations in four press releases issued on

May 13 and May 14, 2013.  *Id.* ¶¶ 44, 45.  Two of the press releases graphically depicted two

large images of Iran President Mahmoud Ahmadinejad.  *Id.*  The press releases named Defendant

Carleton as the contact for media inquiries.  *Id.*

Also on May 13, 2013, UANI posted the allegations in a "sensationalized 'call to action'"

on its website.  *Id.* ¶ 46.  According to Plaintiffs, the home screen of UANI's website showed a

large photograph of Mr. Restis with a picture of a tanker ship in front of him, and featured an

5

active link titled: "Call on Greek Businessman VICTOR RESTIS & RESTIS GROUP ENTITIES to end all Iran business schemes." *Id.* When users clicked on the link, they were taken to a webpage entitled "Action Alert," which encouraged them to "Take Action" by providing their names and contact information. *Id.* UANI promised to then convey to Plaintiffs the individual's demand that they "end their purported role as 'front-men for the illicit activities of the Iranian regime' and their 'very significant, unethical – indeed illegal – support [of] the Iranian MoP . . . .'" *Id.*

On May 14, 2013, UANI further disseminated the statements through Facebook posts and Twitter messages. *See id.* ¶¶ 47, 49-51. Readers of one such Facebook post made at least 33 comments, including insulting and threatening messages that refer to Mr. Restis as "a 'bastard,' an 'animal,' a 'Greek f**k,' a 'crook,' a 'piece of crap,' a 'self satisfied smug bastard without any scruples,' a 'Christian pig,' and an 'evil, greasy, greedy bastard.'" *Id.* ¶ 48.

        2. *July 2013 Communications*

On July 15, 2013, UANI repeated its accusations against Plaintiffs in two press releases consisting of a statement by Defendant Wallace. *Id.* ¶ 52. According to Plaintiffs, the press releases initially attempted to minimize the earlier defamation by falsely claiming that UANI merely expressed its "serious concerns" relating to the purported business dealings between Mr. Restis, Dimitris Cambris, and Iran. *Id.* Nonetheless, these press releases reiterated the earlier defamatory statements and assumed them to be true. *Id.* Indeed, the July 15, 2013 press releases referred to the "dark cloud" surrounding Mr. Restis' business relationships and claimed that Plaintiff failed to adequately describe his activities relating to Mr. Cambis. *Id.* In these publications, UANI called on the United States Government to investigate Mr. Restis and offered to aid the investigation by turning over any relevant materials to the government. *Id.*

6

Also on July 15, 2013, UANI disseminated the press releases through a Facebook post, which contained a photograph of Mr. Restis superimposed on top of an Iranian oil tanker.  *Id.* ¶ 53.  Plaintiffs allege that this Facebook post prompted at least one reader to threaten Mr. Restis with violence.  *Id.*

On the same day, Defendants disseminated the defamatory statements through UANI's Twitter site.  *Id.* ¶ 54.  The tweet juxtaposed a photograph of Ayatollah Khamenei with text calling for the investigation of Mr. Restis.  *Id.*  Then on July 16, 2013, UANI tweeted another message regarding its cooperation with U.S. lawmakers in an effort to shed light on Plaintiff Restis.  *Id.*

Plaintiffs allege that the May 2013 and July 2013 communications had their intended effect:  these false and disparaging statements were widely disseminated and re-published by numerous media outlets, websites and blogs.  *Id.* ¶ 56.

   3. *February 2014 Communications*

In February 2014, Defendants launched a second wave of defamatory publications accusing Plaintiffs of secretly doing business in Iran and falsely denying such activities.  *Id.* ¶ 82. Defendants claimed that the Bergen Max, an EST cargo ship, made multiple ports of call to Iran, and that such activities proved the truth of UANI's initial allegations.  *Id.* ¶¶ 82, 87.  According to Plaintiffs, however, these ports of call involved legal and authorized shipments of humanitarian food aid to Iran, generally by major American companies.  *Id.* ¶ 82.

On February 5, 2014, Defendants issued two versions of a press release regarding the alleged business activities of the Bergen Max.  *Id.* ¶ 87.  The press release implied that the Bergen Max's activities violated the sanctions against Iran through ports of call to the Bandar Imam Khomeini port, which is host to the Iranian regime-controlled front company, Tidewater

7

Middle East Co. ("Tidewater").  *Id.*  According to the press release, both the United States and the European Union have designated Tidewater a sanctioned entity.  *Id.*  The press releases further charged Mr. Restis with falsely denying Defendants' accusations.  *Id.*  Also on February 5, 2014, Defendants tweeted a message regarding the Bergen Max.  *Id.* ¶ 88.  The next day, Defendants published two versions of a press release calling for a boycott of Plaintiffs' businesses and shared the links to the February 5 and 6, 2014 press releases through a Facebook post and three tweets.  *See id.* ¶¶ 89-93.

On February 7, 2014, Defendants issued two versions of a press release regarding UANI's release of a compendium of statements attributed to Mr. Restis or his counsel, denying any business relationships with Iran.  *Id.* ¶ 94.  According to Plaintiffs, the purpose of the press release was to falsely portray Mr. Restis as a liar in connection with such denials.  *Id.*

Plaintiffs allege that Defendants also worked with sympathetic journalists to craft stories that present Plaintiffs unfavorably.  *Id.* ¶ 96.  In particular, on February 8, 2014, Defendants republished an article previously published in *TradeWinds*, a maritime industry publication, which contained a number of false and defamatory statements provided by Defendants regarding settlement negotiations in the instant litigation.  *Id.*  On February 9, 2014, Defendants tweeted a message regarding the *TradeWinds* article, stating that Mr. Restis was unsuccessful in buying UANI's silence.  *Id.* ¶ 97.

On February 10, 2014, Defendants issued two versions of a new press release, which again falsely stated or implied that Plaintiffs violated the sanctions by doing business in Iran and falsely denied such association.  *Id.* ¶ 98.  The press release called for Plaintiffs to cease making ports of call in Iran, and encouraged their business partners to terminate relationships with Mr.

Restis.  *Id.*  Defendants disseminated the press release on that date in three tweets, each with a photograph of Ayatollah Khamenei.  *See id.* ¶¶ 99-101.

On February 11, 2014, Defendants issued two versions of a press release that repeated the defamatory allegations, accused Plaintiffs of falsely denying the allegations, and questioned whether Plaintiffs had any policy relating to business in Iran.  *Id.* ¶ 103.  The next day, Defendants republished on UANI's website a *TradeWinds* article regarding Mr. Restis' denials of the allegations.  *Id.* ¶ 102.

Defendants issued additional press releases on February 17, 19, and 25, 2014.  *See id.* ¶¶ 104-106.  Of particular note, the February 19 press release accused Mr. Restis of trying to avoid giving testimony in the instant litigation by failing to appear for his deposition.  *Id.* ¶ 105.  Plaintiffs state that Defendants purposely scheduled the deposition in New York because they knew Mr. Restis could not leave Greece as part of a criminal investigation in his home country.  *Id.*

Plaintiffs contend that each of the publications in this second wave of the "name and shame" campaign conveyed the defamatory *per se* message that Plaintiffs are, *inter alia*, "'front men' engaged in 'illicit,' 'unethical,' and 'indeed illegal' business 'schemes' with the Iranian regime . . . ."  *Id.* ¶ 107.

According to the SAC, Defendants carefully selected and employed highly offensive and sensational words and images "for the singular purpose of garnering global attention to their ongoing campaign maliciously misinforming" the global community, including regulatory and governmental authorities and the international media, regarding Plaintiffs' business associations in Iran.  *Id.* ¶ 108.

Plaintiffs allege that they have suffered severe reputational harm and extraordinary economic damages in excess of $3 billion, and that Mr. Restis has been subjected to severe emotional distress. *Id.* ¶¶ 125, 130. Plaintiffs claim that as a result of Defendants' campaign, EST has been placed on a "blacklist" of companies that purportedly engage in transactions with Iranian interests, causing the financial institutions on which Plaintiffs rely to carry out their day-to-day operations to refuse to handle even small transactions with Plaintiffs until they receive an official declaration that the transaction does not involve Iran. *Id.* ¶ 127.

Plaintiffs identify three transactions in particular that have been adversely affected as a result of Defendants' campaign against Plaintiffs. First, Mr. Restis asserts that he was unable to complete a planned stock offering for Golden Energy, the tanker company he owned in part and managed. *Id.* ¶ 132. In the year before Defendants' defamation campaign, Golden Energy began the process of listing its stock for trading on the New York Stock Exchange by submitting shares to an initial public offering ("IPO"). *Id.* Golden Energy was days away from submitting its final Form F-1 approval documents to the U.S. Securities and Exchange Commission when, on May 25, 2013, the underwriters "abruptly withdrew" from the IPO. *Id.* ¶¶ 134, 135. Mr. Restis and Golden Energy were forced to postpone the IPO indefinitely as a result. *Id.* ¶ 135. According to Plaintiffs, Golden Energy would have raised an estimated $1.01 billion, with a total estimated value to Mr. Restis personally of hundreds of millions of dollars. *Id.* ¶ 136. Additionally, in the wake of Defendants' allegations, the Cyprus government abruptly terminated the application of Mr. Restis' joint venture, RX-Drill Energy Cyprus Ltd. ("RX-Drill"), for underwater mining rights for natural gas and other hydrocarbons. *Id.* ¶ 137. Plaintiffs assert that such rights would have extended for 35 years and been worth approximately $100 million per year. *Id.* Representatives of the Cyprus government informally confirmed that Defendants' accusations

10

caused the rejection of the RX-Drill application. *Id.* ¶ 138.  Finally, after Defendants published

false allegations that the African Wildcat, one of Plaintiffs' vessels, violated the sanctions,

Plaintiffs were unable to consummate an agreed-upon sale of the vessel because the entities

financing the deal declined to participate in it. *Id.* ¶ 131.

## II. Standard of Review

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all

factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's

favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also, e.g.*, *Ruotolo v.*

*City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).  However, the Court is not required to credit

"mere conclusory statements" or "threadbare recitals of the elements of a cause of action."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss,

a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible

on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  More

specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a

defendant has acted unlawfully." *Id.*  Federal Rule of Civil Procedure 8 "marks a notable and

generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not

unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at

678-79.  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.[5]

## III.   Discussion[6]

### a.   Defamation

"Under New York law, the elements of a defamation claim are 'a false statement, published without privilege or authorization to a third party, constituting fault . . . and it must

---

[5] The Court notes the attachment of several documents to Defendants' counsel's declaration in support of the instant motion.  *See* Declaration of Lee S. Wolosky ("Wolosky Decl.").  Specifically, Defendants submit the following documents:  (1) a translated copy of a November 6, 2012 news article regarding Mr. Restis; (2) a translated copy of a January 31, 2013 news article regarding Mr. Restis; (3) a copy of a May 11, 2013 news article regarding FBB; (4) a copy of a May 11, 2013 press release regarding FBB's transfer of assets and liabilities; (5) a copy of a May 10, 2013 liquidation order relating to FBB; (6) portions of the Office of Foreign Assets Control's Blocked Persons List; (7) a copy of a May 13, 2013 letter from UANI to Mr. Restis; (8) a copy of a May 16, 2013 letter from Mr. Restis' counsel to Defendant Wallace; (9) a copy of a May 17, 2013 letter from UANI to Mr. Restis; (10) a copy of a May 13, 2013 letter from UANI to Mr. Restis' counsel; (11) a copy of a June 24, 2013 letter from UANI to Mr. Restis' counsel; (12) a copy of a July 3, 2013 email from Mr. Restis' counsel to Defendant Wallace; and (13) a copy of a July 3-7, 2013 email exchange between Mr. Restis' counsel and Defendant Wallace.  *See id.* ¶¶ 3-15.

"In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)."  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered.  *Id.*  And even if not attached or incorporated by reference, "a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court" in ruling on a 12(b)(6) motion.  *Id.* (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992)).  A "mere passing reference or even references" to a document outside of the complaint, however, does not, on its own, incorporate the document into the complaint itself.  *Williams v. Time Warner Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011).

Exhibits 7 and 12 (the May 13, 2013 UANI letter and the July 3, 2013 email from Mr. Restis' counsel), are attached as exhibits to the Original Complaint and referenced as exhibits in the proposed SAC.  The remainder of the documents, however, will not be considered by the Court in ruling on the instant motion.

While the documents attached as Exhibits 1 and 2 (the copies of the November 6, 2012 and January 31, 2013 news articles regarding Mr. Restis) were discussed in the Original Complaint, Plaintiffs omitted such references from the Amended Complaint and the SAC.  Pls. Opp. Mem. L. 31 n.7.  And because the majority of the remaining documents are not even referenced in Plaintiffs' pleadings, *see id.* at 31, they cannot be said to be integral to the SAC.

[6] As an initial matter, the Court declines to dismiss the SAC for failure to comply with Rule 8 of the Federal Rules of Civil Procedure.  Defs. Mem. L. 11.  Defendants contend that Plaintiffs' pleadings are "far from" a short and plain statement of the claims.  *Id.*  However, as Plaintiffs correctly address, "even under the liberal standard of Rule 8," plaintiffs must identify the defamatory statements at issue, as well as provide the context for such statements.  Pls. Opp. Mem. L. 4 (quoting *Treppel v. Biovail Corp.*, No. 03 Civ. 3002 (PKL), 2005 WL 2086339, at *8 (S.D.N.Y. Aug. 30, 2005)); *see also Sawyer v. Musumeci*, Nos. 96 Civ. 6497 (LLS), 96 Civ. 6689 (LLS), 1997 WL 381798, at *2 (S.D.N.Y. July 9, 1997), *aff'd*, 165 F.3d 14 (2d Cir. 1998) (dismissing defamation claims for failure to satisfy Rule 8(a) where the pleadings were "too conclusory" and did not identify the statements at issue or whether the statements were made in the scope of defendant's employment).

either cause special harm or constitute defamation per se.'"  *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003) (quoting *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999)); *see also Harris v. Allstate Ins. Co.*, 83 F. Supp. 2d 423, 434 (S.D.N.Y. 2000). Plaintiffs allege that Defendants' "name and shame" campaign was based on defamatory *per se* accusations.  *See, e.g.*, SAC ¶ 142.[7]

Defendants offer two principal arguments for the dismissal of the defamation claim. First, they contend that the claim cannot be sustained as against certain defendants.  *See* Defs. Mem. L. 12.  Second, Defendants argue that none of the statements identified by Plaintiffs state a claim for defamation.  *Id.* at 18.  The Court will consider these arguments in turn.

1.  *Claims Against the Individual Defendants*

Defendants charge that the defamation claim must be dismissed against certain individual defendants because the SAC fails to allege that those defendants participated in the creation or publication of the statements at issue.  *Id.* at 12.[8]  "[U]nder New York law, 'all who take part in the procurement, composition and publication of a libel are responsible in law and equally so.'" *Treppel*, 2005 WL 2086339, at *3 (quoting *Brown v. Mack*, 56 N.Y.S.2d 910, 916 (N.Y. Sup. Ct., Kings Cnty. 1945)); *see also Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 147 n.19 (E.D.N.Y. 2010) (same).  Thus, a defamation claim cannot survive without an allegation that the

---

[7] The New York Court of Appeals has held that the following four categories of statements are defamatory *per se*: (1) those that accuse the plaintiff of a serious crime; (2) those that tend to injure another in his or her trade, business or profession; (3) those that accuse the plaintiff of having a loathsome disease; and (4) those that impute unchastity to a woman.  *See Stern v. Cosby*, 645 F. Supp. 2d 258, 273 (S.D.N.Y. 2009) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (N.Y. 1992)).  Plaintiffs claim Defendants' statements to be defamatory *per se* because the statements accuse Plaintiffs of serious crimes and have injured Plaintiffs professionally.

[8] In particular, Defendants claim in the instant motion that Plaintiffs have failed to plead defamation against Defendants Ibsen and Carleton on this basis.  However, Defendants' motion to dismiss was filed before both the Amended Complaint and the SAC.  Since the filing of the Original Complaint, Plaintiffs have added allegations regarding Defendants Ibsen and Carleton, and have named five additional individual defendants.

defendant participated in the creation *or* the publication of the statements at issue. *Treppel*, 2005 WL 2086339, at *3.

While the Original Complaint provided little more detail regarding Defendants Ibsen and Carleton than their names and titles, the SAC adequately alleges defamation against these defendants. With respect to Mr. Ibsen, the SAC specifies that he runs the day-to-day operations of UANI, directed the "name and shame" campaign against Plaintiffs, participated in drafting the defamatory publications, and coordinated UANI staff in producing and distributing the publications. SAC ¶ 27. Similarly, Plaintiffs claim that Mr. Carleton, *inter alia*, directs UANI's public communications, has been integrally involved in the campaign against Plaintiffs, helped draft the defamatory publications, distributed many of them as press releases, and communicated with various reporters to spread the allegations. *Id.* ¶ 28. Clearly then, Defendants' argument that Plaintiffs have not pleaded defamation against Defendants Ibsen and Carleton is no longer viable.

Plaintiffs have also adequately stated a claim for defamation against the five individual defendants added in the SAC. First, the SAC alleges that Defendants Shamir, Pham, and Roth participated in the drafting and publication of the defamatory statements. *See id.* ¶¶ 29, 32, 33. Similarly, the SAC adequately pleads the participation of Ms. Lukash because she allegedly helped craft the defamatory statements and readied them for publication, as well as drafted an "Action Alert" sent to UANI readers informing them of the defamatory allegations. *See id.* ¶ 30. Finally, Defendant House is alleged to have met with a reporter for a maritime industry publication to further disseminate the defamatory allegations. *Id.* ¶ 31. The SAC also notes that according to Mr. House's LinkedIn profile, he leads campaigns for UANI that publicize major shipping sanctions frauds. The allegations of his involvement in the publication of UANI's

14

statements are sufficient.  *See Treppel*, 2005 WL 2086339, at \*3 (stating that defamation may be pleaded against *all* who take part in the publication of actionable statements); *cf. Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 179 (E.D.N.Y. 2006) (finding that plaintiff adequately pleaded defamation against former co-workers who were alleged to have, *inter alia*, prepared and approved for publication the statement at issue).  Accordingly, because each individual defendant allegedly participated in the drafting and/or publication of the defamatory statements, Plaintiffs' defamation claim cannot be dismissed on this basis.

      2.  *Non-Actionable Statements*

          i.  *Facebook Comments*

Defendants claim that any defamation claim predicated on the defamatory Facebook posts or comments of third persons must be dismissed.  Defs. Mem. L. 19.  In particular, according to Defendants, Section 230(c)(1) of the Communications Decency Act of 1996 directs that "no provider or user of an interactive computer service shall be treated as a publisher or speaker of any information provided by another information content provider."  *Id.*; *see* 47 U.S.C. § 230(c)(1).  Plaintiffs state in response that the Facebook comments of third parties are included in the pleadings as only examples of the *damage* caused by UANI's defamatory statements, and clarify that they seek to hold Defendants accountable only for their defamatory comments, not those of others.  Pls. Opp. Mem. L. 26.  Accordingly, Defendants will not be held to account for the Facebook posts of third parties.  *Cf. Hammer v. Amazon.com*, 392 F. Supp. 2d 423, 431 (E.D.N.Y. 2005) (dismissing defamation claim against Amazon.com based on book reviews posted on the website by a third party).

ii.    *True Statements*

Defendants next contend that they cannot be liable for statements that are substantially true.  Defs. Mem. L. 20.  Specifically, Defendants argue that UANI statements regarding the following are true, as proven by reports cited by, and therefore incorporated by reference in, the Original Complaint:  (i) FBB's "split into a 'good' and a 'bad' bank due to 'rising bad debts and losses," and property-related tax evasion charges against Mr. Restis as a result of intentional undervaluing of investments in Cyprus, and (ii) accusations that FBB executives and shareholders, including Mr. Restis, took out loans from the Greek state worth hundreds of millions of Euros, which are unlikely to be repaid.  *Id.*; *see* Compl. ¶¶ 53(k), 53(l).  Because the SAC omits any references to these statements by UANI, the Court need not consider the parties' arguments on this ground.

iii.    *Statements Not Capable of Defamatory Meaning*

On a motion to dismiss a claim of defamation, the court must decide whether the statements alleged to have caused plaintiff injury are "reasonably susceptible" to the defamatory meaning imputed to them.  *Dworin v. Deutsch*, No. 06 Civ. 13265 (PKC), 2008 WL 508019, at *3 (S.D.N.Y. Feb. 22, 2008) (quoting *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986)).  A statement is "reasonably susceptible" of a defamatory meaning "when it 'tend[s] to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community.'"  *Id.* at *3 (quoting *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) (internal quotation marks and citation omitted)).

Under New York law, expressions of pure opinion, as opposed to statements of fact, are not actionable, and receive full constitutional protection.  *Torain v. Liu*, 279 F. App'x 46, 46 (2d Cir. 2008).  "[W]hether a statement is opinion or rhetorical hyperbole as opposed to a factual

16

representation is a question of law for the court." *Mr. Chow v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985); *see also Levin*, 119 F.3d at 196 (holding that resolution of whether a statement amounts to fact or opinion is a matter for the court under New York law).  The following three factors are generally considered by New York courts to determine whether a statement is actionable fact or non-actionable opinion:  (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.  *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 156 (N.Y. 1993) (quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 292 (N.Y. 1986)); *see also Levin*, 119 F.3d at 197 ("Instead of parsing out and evaluating the challenged statements in isolation, New York courts look to the immediate context and the broader social context of the statement, and evaluate the impact that the statements would have on a reasonable reader." (internal citations omitted)); *Chau v. Lewis*, 935 F. Supp. 2d 644, 658 (S.D.N.Y. 2013) (stating that courts must avoid the "hypertechnical parsing of written and spoken words for the purpose of identifying possible facts that might form the basis of a sustainable libel action." (quoting *Gross*, 82 N.Y.2d at 156 (internal quotation marks omitted))).  "At bottom, the inquiry is whether a reasonable listener is likely to have understood the statements as conveying provable facts about the plaintiff." *Torain*, 279 F. App'x at 46.  "When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact." *Levin*, 119 F.3d at 197.

Unlike the Federal Constitution, the New York Constitution provides for absolute protection of opinions. *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000). "If, however, the facts upon which an opinion is based are set forth for the reader, and the plaintiff alleges that both the opinion and the facts upon which it is based are false, the opinion and facts may form the basis of the defamation claim." *Dworin*, 2008 WL 508019, at *3 (citing *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 377 (S.D.N.Y. 1998)).  In addition, a statement of opinion which implies that it is based on facts that support the opinion, which are unknown to persons reading or hearing it, is an actionable "mixed opinion." *Id.* (quoting *Steinhilber*, 68 N.Y.2d at 289).  Furthermore, opinions based on false facts are actionable against a defendant who had knowledge of the falsity or probable falsity of the underlying facts. *Davis v. Ross*, 754 F.2d 80, 86 (2d Cir. 1985) (quoting *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 114 (2d Cir. 2010) (reversing dismissal of a defamation claim based on a statement of opinion because plaintiff properly alleged that defendants had knowledge of the falsity of the underlying facts).

Defendants argue that the UANI statements cited in Plaintiffs' allegations are not capable of defamatory meaning for four principal reasons.

> a) *Statements Containing Words or Phrases Not Capable of Being Proved True or False*

First, Defendants assert that certain statements made by UANI are not capable of being proven true or false because of language that is "loose, figurative, hyperbolic, or otherwise too vague to impart factual information." Defs. Mem. L. 23.  In particular, Defendants claim that assertions that conduct is illegal or fraudulent can, depending on the context in which such statements were made, be too vague to be actionable. *Id.*  Accordingly, Defendants argue that

the Court should strike or dismiss, *inter alia*, the following paragraphs from the SAC to the

extent they rely on such words or phrases as "illegally," "scheme," and "illicit":

- "UANI is seriously alarmed by your relationships with Dimitris Cambis, . . . a notorious Greek businessman recently sanctioned by the U.S. government for conspiring with the Iranian regime and [the MoP], to *illegally* export Iranian oil in violation of international sanctions." SAC ¶ 57(b) (emphasis added).

- "Clearly, the purpose of the partnership between FBB and the stigmatized and sanctioned Cambis, and MoP, respectively, is to secure Iranian regime control over FBB, a non-sanctioned and seemingly legitimate entity headed by an ostensibly credible Greek businessman with the façade of an EU-protected financial institution, in order to enable the Iranian regime to engage in, and enlarge, its *fraudulent* financial and shipping activity in exchange for an enormous investment from the Iranian regime." *Id.* ¶ 57(d) (emphasis added).

- "UANI is also in possession of a second document corroborating the main details of the first, namely that the Iranian MoP plans to invest heavily in FBB. The second document is an agreement letter – addressed to you in your role as Chairman of FBB – and is apparently written by a Cypriot consulting company, CONCEPT CONSULTING Ltd. With no notable online presence aside from a poorly constructed Facebook page, CONCEPT CONSULTING is in all likelihood a *front company*, set up for the sole purpose of enabling the deal between FBB and the MoP by imparting the relationship with an *undeserving veneer of legitimacy*." *Id.* ¶ 57(e) (emphasis added).

- "Both documents – the letter from Cambis and the consultancy engagement agreement letter – confirm the existence of a *scheme* in which FBB serves as a front for the MoP in exchange for an infusion of investment from the Iranian regime. Clearly, you and Cambis are acting as *front-men* for the Iranian MoP, enabling the regime to massively expand its capacity to finance *illicit* shipping operations." *Id.* ¶ 57(g) (emphasis added).

Defendants' piecemeal approach here is misguided. In *Immuno AG v. Moor-Jankowski*,

the New York Court of Appeals stated that "[i]t has long been our standard in defamation actions

to read published articles in context to test their effect on the average reader, *not to isolate

particular phrases but to consider the publication as a whole*." 77 N.Y.2d 235, 250 (N.Y. 1991)

(emphasis added); *see also Steinhilber*, 68 N.Y.2d at 290 (noting that the "essential task" is to

decide whether the words complained of, considered in the context of the *entire communication*

19

and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion); *Brian v. Richardson*, 87 N.Y.2d 46, 51 (N.Y. 1995) (citing *Immuno* for the proposition that courts should not "sift[] through a communication" to isolate and identify assertions of fact, but should instead look to the overall context in which the assertions were made).  Defendants have not demonstrated that the words and phrases at issue here are loose, figurative, hyperbolic, or vague.  For this argument, Defendants rely upon *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130 (N.Y. 1992).  There, the New York Court of Appeals considered a defamation claim involving such words as "illegal" and "fraudulent."  However, the context in which those statements were made makes Defendants' reliance on *Von Gutfeld* unavailing.

In *Von Gutfeld*, the defendant, the president of a condominium board, spoke out at a public hearing against a proposal to create a sidewalk cafe adjacent to the plaintiff's restaurant.  *See id.* at 133-34.  The defendant raised problems with smells and parking congestion, and stated, *inter alia*, that plaintiff sought the cafe because it maintained an "illegal lease" with the restaurant's former landlord.  *Id.* at 134-35.  He went on to say that the proposal was "as fraudulent as you can get and it smells of bribery and corruption."  *Id.* at 135.  The defendant concluded the speech by stating that the board was "sure as hell" not going to grant the proposal and by "hit[ting] the table with his hand."  *Id.*  The court determined that a reasonable listener at a "heated public hearing" would not have understood the defendant's "as fraudulent as you can get" comment as denoting factual assertions or implying undisclosed defamatory fact as the basis for the opinion.  *Id.* at 143.  The court similarly dismissed the statement regarding the "illegal lease" because a reasonable person would not conclude either that a private lease governed a public sidewalk or that the lessee engaged in criminal conduct by signing and accepting the

20

terms of the document. *Id.* at 144-45; *see also Finkelstein v. Wachtel*, No. 00 Civ. 2672 (JSM), 2003 WL 1918309, at *6 (S.D.N.Y. Apr. 21, 2003) (relying on *Von Gutfeld* for the conclusion that a consultant's statements that a failing company's former chairman and chief executive officer was a "crook" who ran a "very dirty business" must be viewed as loose, figurative, or hyperbolic); *McNamee v. Clemens*, 762 F. Supp. 2d 584, 604 (E.D.N.Y. 2011) ("Colloquial phrases like 'shake down' or 'crawling up your back' are hyperbolic; they are 'loose' statements that don't reasonably convey the specificity that would suggest that Clemens or his agents were seriously accusing McNamee of committing the crime of extortion.").

In contrast, UANI's statements were not made spontaneously at a "heated public hearing," nor are they intemperate in tone. Rather, the statements are alleged to have been made as part of a sophisticated and coordinated international campaign in letters, press releases, Facebook posts, and tweets drafted by communications professionals and former diplomats. Defendants presumably meant what they said and intended their words to be understood in accordance with their plain meaning. In addition, Defendants' accusations are grounded in assertions of fact about Plaintiffs' business activities and are not framed in hyperbole, but rather purport to rely on documents that establish the existence of Plaintiffs' "scheme." *Cf. Kelly*, 806 F.2d at 48 (finding statement that plaintiff priests placed church property "in their own names" to be factual and imputing corrupt and possibly criminal conduct); *Coliniatis v. Dimas*, 848 F. Supp. 462, 466, 467 (S.D.N.Y. 1994) (determining that letter making accusation on "information of substantial but not absolute reliability" that company executive was engaged in a kick-back scheme could be factually verified and did not contain loose, figurative, or hyperbolic language that would negate the impression that the writer was asserting a statement of fact); *Held v. Pokorny*, 583 F. Supp. 1038, 1040 (S.D.N.Y. 1984) (noting that while rhetorical hyperbole and

21

vigorous epithets are expressions of opinion, "[a]ccusations of criminal or unethical activity . . .
are expressions of fact, as are allegations relating to one's professional integrity that are
susceptible of proof" (foonotes omitted)); *see also Trump v. Chi. Tribune Co.*, 616 F. Supp.
1434, 1435 (S.D.N.Y. 1985) ("[W]hen the criticism takes the form of accusations of criminal or
unethical conduct, or derogation of professional integrity in terms subject to factual verification,
the borderline between fact and opinion has been crossed."); *Giffuni v. Feingold*, 749 N.Y.S.2d
716, 716 (1st Dep't 2002) (finding that certain statements were not loose, figurative, or
hyperbolic, "especially since" they alleged criminal conduct).  Accordingly, the Court denies
Defendants' motion to dismiss or strike the above paragraphs as incapable of being proven true
or false.

### b)  *Calls for Action*

Defendants next contend that statements calling for government officials or the public to
take action are not capable of defamatory meaning and cannot support a claim for defamation
because they cannot be proven true or false.  Defs. Mem. L. 24.  Plaintiffs counter that such an
argument seeks to invent a new standard where parties could "cloak any outrageous, defamatory
claims in a call to action and face no liability."  Pls. Opp. Mem. L. 28.  Indeed, the Court is not
aware of any case law from the Second Circuit or New York state courts that stands for the
principle that "calls to action" cannot be actionable as defamatory statements.  Moreover, as
noted by Plaintiffs, the cases Defendants cite for this proposition are inapposite.  *See Org. for a
Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (First Amendment case not involving
defamation claim); *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 507-08 (S.D.N.Y. 2012)
(dismissing defamation claim on the basis that defendant's accusations of anti-Semitism were
found to be either not plausibly false or statements of opinion).  Accordingly, Defendants'

request that the Court dismiss or strike statements in the SAC identified as calls to action is denied.

### c)   *Non-Actionable Opinions*

Defendants further contend that the context in which UANI's statements were made renders them non-actionable.  Defs. Mem. L. 25.  First, Defendants charge that their statements are protected as "pure advocacy" by virtue of the fact that the statements advance UANI's mission as an advocacy group.  *Id.* at 27.  To the contrary, the mere fact that Defendants engage in advocacy does not give them blanket immunity to make false accusations.  Pls. Opp. Mem. L. 23.  Indeed, none of the authorities on which Defendants rely stands for the proposition that advocacy cannot as a matter of law give rise to a defamation claim.  *See Egiazaryan*, 880 F. Supp. 2d at 510 (stating that speech including epithets, fiery rhetoric, and hyperbole signal advocacy, not that advocacy is protected speech); *Brian*, 87 N.Y.2d at 53 (noting that the context in which challenged statements were made—an Op-Ed piece "rife with rumor, speculation and seemingly tenuous inferences"—supported conclusion that accusations of an illegal conspiracy could not have been understood by a reasonable reader as assertions of fact); *Yang v. Shanghai Cafe Inc.*, No. 10 Civ. 8372, 2012 WL 398641, at *4 (S.D.N.Y. Feb. 8, 2012) (finding that restaurant workers' flyers advocating boycott of restaurant for wage theft contained statements of pure opinion because of, *inter alia*, the flyers' tone and title—"Dumpling Festival Corporate Sponsor . . . Exploits Workers and Should be Punished"—and the use of the word "exploit").

Second, Defendants argue that the specific context of UANI's publications makes their contents non-actionable opinions.  Defs. Mem. L. 27.  In particular, Defendants claim UANI's use of "contextual signals" alerts the readers that the statements reflect conclusions and opinions.  *Id.*  For example, Defendants point to the use of the word "clearly" in the following statement as

indication that its contents consist of opinion rather than fact: "Clearly, the purpose of the

partnership between FBB and the stigmatized and sanctioned Cambis, and MoP . . . is to secure

Iranian regime control over FBB . . . in order to enable the Iranian regime to engage in, and

enlarge, its fraudulent financial and shipping activity . . . ." *See id.* at 28; SAC ¶ 57(d).

However, as the Supreme Court noted in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990),

"[T]he statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the

statement, 'Jones is a liar.'"  Indeed, "[s]imply couching such statements in terms of opinion

does not dispel the[ir] implications."  *Id.*; *see also Joyce v. Thompson Wigdor & Gilly LLP*, No.

06 Civ. 15315 (RLC) (GWG), 2008 WL 2329227, at *11 (S.D.N.Y. June 3, 2008) (employer

could be liable for statement that it "suspect[ed]" employee falsified health claims because the

reader could assume that employer had facts to support the statement); *In re Longtop Fin. Techs.*

*Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 580 n.134 (S.D.N.Y. 2012) (citing *Milkovich* for the

proposition that a statement explicitly labeled as an opinion may still be actionable if it implies a

false or unreasonable statement of fact).  Accordingly, Defendants have failed to demonstrate

how the use of the "contextual signals" here makes any of the statements in the SAC non-

actionable.

Defendants further argue that UANI's presentation of the evidence on which its

conclusions were based reflects Defendants' expression of opinion.  Defs. Mem. L. 28.

However, UANI's statements are still actionable if either the facts on which they rely are false or

if the statements mischaracterized the facts.  *See Medcalf v. Walsh*, 938 F. Supp. 2d 478, 486

(S.D.N.Y. 2013) ("'[A] statement of opinion that is accompanied by a recitation of the facts on

which it is based or one that does not imply the existence of undisclosed underlying facts' is

protected as a statement of opinion and thus not a false statement of fact." (quoting *Gross*, 82

N.Y.2d at 154)); *Dworin*, 2008 WL 508019, at *3.  Here, Plaintiffs claim both that the documents on which Defendants relied are "patently fraudulent," and that Defendants mischaracterized the documents.[9]  Pls. Opp. Mem. L. 24.

Moreover, a statement may still be actionable if it implies that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader.  *Sang v. Hai*, 951 F. Supp. 2d 504, 520 (S.D.N.Y. 2013) (quoting *Levin*, 119 F.3d at 197).  Indeed, such statements may be actionable because a reasonable listener or reader would infer that the speaker or writer "knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person toward whom the communication is directed."  *Gross*, 82 N.Y.2d at 153 (internal quotation marks omitted) (quoting *Steinhilber*, 68 N.Y.2d at 290).  Plaintiffs allege that Defendants concealed from public review and scrutiny the two documents UANI cited as corroboration for the accusations.  SAC ¶¶ 109(d), 140(d).  Defendants contend, on the other hand, that they disclosed the facts relating to the Cambis Letter and Consultancy Agreement, and therefore the fact that they did not publish the two documents does not diminish the protected nature of UANI's statements.  Defs. Mem. L. 28-29.  Because those documents are not before the Court, the Court cannot determine whether Defendants have adequately represented the facts from the source documents, or for that matter, established their authenticity.

In sum, then, the Court rejects the argument that the context of UANI's statements protects Defendants from liability.

---

[9] Plaintiffs allege that Anastasios Pallis, a "disgraced Greek businessman" who stole millions of dollars from Plaintiff Restis, forged the two documents and provided them to Defendants.  SAC ¶ 13.

Plaintiffs claim that Defendants mischaracterized the documents by stating that they were "confirmation" and "corroboration" of Defendants' assertions of Plaintiffs' involvement in illegal activities with the Iranian regime.  *Id.* ¶ 145.

d)  *UANI Press Releases, Tweets, and Facebook Posts*

Finally, Defendants contend that UANI's press releases, tweets, and Facebook posts are non-actionable because they "did no more than include a headline-like caption or statements, and directed readers to the longer and more thorough statements of UANI's opinion through links." Defs. Mem. L. 29.  In *Triano v. Gannett Satellite Information Network, Inc.*, Nos. 09 Civ. 2497 (KMK), 09 Civ. 2533 (KMK), 2010 WL 3932334, at *4 (S.D.N.Y. Sept. 29, 2010), the court relied on New York state court precedent for the principle that a headline is not actionable if it is a "fair index" of the article in which it appears.  *See also Karedes v. Ackerley Grp.*, 423 F.3d 107, 115 n.1 (2d Cir. 2005) (noting that plaintiff's argument that a newspaper headline is independently libelous regardless of whether the content of the article is itself libelous "adds little" in light of the plaintiff's concession that the headline fairly indicated the substance of the article); *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009) (finding use of the word "SCAM" in article headline was a fair index of the article's contents and that the allegedly libelous statements fell within the "true and fair" privilege of N.Y. Civil Rights Law § 74).  While Defendants accurately proffer the standard for whether a headline is actionable, they provide no case law applying this principle to press releases, Facebook posts, or tweets, which provide more factual content than mere headlines.

To the contrary, decisions from courts in this Circuit suggest that defamatory statements published on Facebook and Twitter, as well as statements made in press releases, could indeed be actionable in defamation suits.  *See DiFolco*, 622 F.3d at 114 (holding that reporter stated a claim for defamation based on statements made on television industry website); *Pisani*, 440 F. Supp. 2d at 179 (denying motion to dismiss defamation claim based on allegations that defendants prepared and approved for publication statements issued in press release on attorney

26

general's website regarding plaintiff's involvement in Medicaid fraud case); *see also Miss Universe L.P. v. Monnin*, 952 F. Supp. 2d 591, 598 (S.D.N.Y. 2013) (confirming arbitration award on basis that arbitrator did not exceed powers in awarding $5 million in damages for defamation where statements were made, *inter alia*, on Facebook; arbitrator had found that the defamatory Facebook posts were factual, capable of proof, false, and "obviously harmful to [plaintiff's] business reputation" (internal quotation marks and citation omitted)); *Feld v. Conway*, --- F. Supp. ----, No. 13 Civ. 13122 (FDS), 2014 WL 1478702, at *3 (D. Mass. Apr. 14, 2014) (granting motion to dismiss defamation claim based on tweet because the statement expressed an opinion).  Defendants have not proffered any authority for the proposition that statements made on Twitter, Facebook, or through press releases are the functional equivalent of headlines and thus not actionable if they represent a fair index of some other statement. Moreover, the tweets and Facebook posts were distinct from the related UANI statements at least in part because of their juxtaposition with images of President Ahmadinejad and Ayatollah Khamenei.  Accordingly, the defamation claim cannot be limited on this basis.[10]

For the reasons set forth above, Defendants' motion to dismiss the defamation claim is DENIED.

### b. Tortious Interference with Prospective Economic Advantage

Plaintiffs allege that Defendants tortiously interfered with Plaintiffs' business relationships.  Under New York law, the elements of a claim for tortious interference with prospective economic advantage are (1) a business relationship with a third party; (2) the

---

[10] It is also worth noting the well-accepted principle that the republication of defamatory statements itself constitutes defamation under New York law.  *See Levin v. McPhee*, 917 F. Supp. 230, 237 (S.D.N.Y. 1996) ("It has long been the rule that one who republishes a libel is guilty of libel" (citing *Cianci v. N.Y. Times Publ'g Co.*, 639 F.2d 54, 61 (2d Cir. 1980)); *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 139 (S.D.N.Y. 1991) (quoting *Cianci* for the principle that one who repeats or otherwise republishes defamatory matter is ordinarily subject to liability as if he had originally published it).

defendant's knowledge and intentional interference with that relationship; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) injury to the business relationship. *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)).

Plaintiffs base this claim on allegations that Defendants knew of Plaintiffs' relationships with various third parties—including the underwriters for the Golden Energy IPO and the government of Cyprus in connection with the RX-Drill mining rights agreement[11]—and that Defendants' actions were designed to interfere with Plaintiffs' business relations and prospective economic advantage. *See* SAC ¶¶ 151-53. In particular, Plaintiffs claim that Defendants' defamatory statements were directed in part at the Golden Energy IPO underwriters and the government of Cyprus. *Id.* ¶ 153.

In *Chao v. Mount Sinai Hospital*, the Second Circuit observed that "'New York law considers claims sounding in tort to be defamation claims . . . where those causes of action seek damages only for injury to reputation, [or] *where the entire injury complained of by plaintiff flows from the effect on his reputation*.'" 476 F. App'x 892, 895 (2d Cir. 2012) (emphasis added) (quoting *Jain v. Sec. Indus. & Fin. Mkts. Ass'n*, No. 08 Civ. 6463 (DAB), 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009)).[12] There, the court affirmed the dismissal of, *inter alia*, a tortious interference with prospective business advantage claim on a Rule 12(b)(6) motion because the factual allegations underlying the claim were "virtually identical" to the facts underlying a defamation claim. *Id.* Specifically, both causes of actions were premised on

---

[11] Plaintiffs do not link the aborted sale of the vessel, the African Wildcat, to either tortious interference claim in the SAC.

[12] *Cf. Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991) (noting that the plaintiff was not attempting to use a promissory estoppel cause of action under Minnesota state law "to avoid the strict requirements for establishing a libel or defamation claim" where the plaintiff could not sue for defamation because the information disclosed was true).

allegations that defamatory statements were made in the course of the defendant hospital's internal investigation into the plaintiff professor's research misconduct.  *Id.* at 894.  The court further concluded that the harms the professor claimed to have suffered as a result of the non-defamation tort causes of action—including the termination of his employment—all flowed from the effect on his reputation caused by the alleged defamatory statements.  *Id.* at 895.

Similarly, in *Jain*, the plaintiff brought claims for defamation and, *inter alia*, tortious interference with prospective business relations based on statements made in a letter written by a trade organization's board secretary, director, and general counsel.  2009 WL 3166684, at *1. There, the plaintiff alleged that the defendant forwarded copies of the letter to the plaintiff's co-workers, and that she was terminated as a result.  *Id.* at *2.  After dismissing the defamation claim, the court found that "the gravamen of Plaintiff's alleged injury [with respect to the tortious interference claim] . . . is either harm to her reputation or harm that flows from the alleged effect on Plaintiff's reputation, such as her termination from S & P, the resulting loss of income and benefits, as well as the inability to find additional work."  *Id.* at *9.  Accordingly, the court dismissed the tortious interference claim because the allegations and related injuries arose from the dissemination of the letter and the alleged effect it had on the plaintiff's professional reputation, both inside and outside of the firm.  *Id.* at *10.

Plaintiffs' tortious interference with prospective economic advantage claim is foreclosed by *Chao*.  While Plaintiffs allege in connection with this cause of action that they have suffered economic injuries, including lost profits, loss of third party contracts and economic opportunities, *see* SAC ¶ 155, all of these alleged injuries arose out of UANI's allegedly defamatory statements.  For example, the SAC states that the campaign irreparably damaged the reputation of Golden Energy in the eyes of potential investors and regulators, and that the

"deciding factor" for the underwriters' withdrawal was Defendants' false allegations that
Plaintiffs were "front-men" for the Iranian regime and engaged in illegal business schemes.  *Id.* ¶
135.  Similarly with respect to the RX-Drill joint venture, Plaintiffs allege that representatives of
the Cyprus government informally confirmed that the government terminated the agreement in
principle because of Defendants' defamatory statements.  *Id.* ¶ 138.  Specifically, Plaintiffs claim
they were told that the Cyprus government would not conduct business with Mr. Restis and his
companies because it feared the criticism and accusations it would face for "cooperating with a
'conspirator' and a 'financier of international terrorism.'"  *Id.*  Accordingly, as in *Chao* and *Jain*,
the entire injury pleaded in relation to the tortious interference with prospective economic
advantage cause of action flows from the effect of the defamatory comments on Plaintiffs'
reputation.  Defendants' motion to dismiss the tortious interference with prospective economic
advantage claim is therefore GRANTED.[13]

### c.  Tortious Interference with Contract

Plaintiffs claim that Defendants are liable for tortious interference in connection with
Plaintiffs' "contracts with various financial institutions, underwriters involved in the IPO of
Golden Energy and the government of Cyprus."  SAC ¶ 158.  Under New York law, the elements
of tortious interference with contract are (1) the existence of a valid contract between the
plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's
intentional procurement of the third party's breach of the contract without justification; (4) actual
breach of the contract; and (5) damages resulting therefrom.  *See Kirch*, 449 F.3d at 401 (quoting
*Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (N.Y. 1996)).  A plaintiff must

---

[13] For the same reason, as well as other reasons discussed below, the remainder of Plaintiffs' claims, all of which
sound in tort, will also be dismissed.

allege that there would not have been a breach but for the activities of defendants.  *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990) (quoting *Special Event Entm't v. Rockefeller Ctr., Inc.*, 458 F. Supp. 72, 78 (S.D.N.Y. 1978)).

As an initial matter, as with the tortious interference with prospective economic advantage claim, this claim must fail as duplicative of the defamation cause of action.  *See Chao*, 476 F. App'x at 895 (affirming dismissal of tortious interference with contract claim where plaintiff also alleged defamation claim and the alleged injury flowed from harm to reputation). This cause of action is also premised on alleged contracts with the underwriters for the Golden Energy IPO and the government of Cyprus.  Accordingly, this cause of action is also foreclosed by *Chao*.  Moreover, the tortious interference with contract claim fails for two further reasons.

First, this claim must be dismissed because, *inter alia*, the named Plaintiffs were not parties to the contracts at issue.  Plaintiffs argue in opposition that they have pleaded Mr. Restis' ownership interests in both Golden Energy and the RX-Drill joint venture, Pls. Opp. Mem. L. 14; *see* SAC ¶¶ 132-138, and rely on *LoPresti v. Massachusetts Mutual Life Insurance Co.*, 30 A.D.3d 474, 476 (2d Dep't 2006), for the proposition that even if Plaintiffs were not direct parties to the agreements in question, they can still bring the tortious interference claim as a third-party beneficiary of such contracts.  Pls. Opp. Mem. L. 14.  Plaintiffs have not pleaded facts sufficient to satisfy the elements of a third-party beneficiary claim.  Defs. Reply Mem. L. 8; *see, e.g.*, *Found. Ventures, LLC v. F2G, Ltd.*, No. 08 Civ. 10066 (PKL), 2010 WL 3187294, at *9 (S.D.N.Y. Aug. 11, 2010) (stating that in order to claim third-party beneficiary status under New York law, plaintiff must plead (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for the third party's benefit, and (3) that the benefit to plaintiff is sufficiently immediate, rather than incidental, to indicate the assumption by

31

the contracting parties of a duty to compensate the plaintiff if the benefit is lost (quoting

*Henneberry v. Sumitomo Corp.*, No. 04 Civ. 2128 (PKL), 2005 WL 991772, at *12 (S.D.N.Y.

Apr. 27, 2005)).

Courts in this Circuit have consistently denied tortious interference with contract claims

where the plaintiff was neither a party to, nor an intended third-party beneficiary of, the contract

in question.  *See, e.g.*, *Wells Fargo Bank Nw., N.A. v. Energy Ammonia Transp. Corp.*, No. 01

Civ. 5861 (JSR), 2002 WL 1343757, at *1 (S.D.N.Y. June 18, 2002) (granting motion to dismiss

tortious interference with contract counterclaim on ground that defendants lacked standing

because they were neither parties to, nor third-party beneficiaries of, the contract at issue); *cf.*

*LoPresti*, 30 A.D.3d at 476 (dismissing tortious interference with contract claim because plaintiff

was neither a party to, nor a third-party beneficiary of, the contracts with which defendants

allegedly interfered).

Plaintiffs have not pleaded that they were third-party beneficiaries of the agreements in

question, and have not provided sufficient details regarding those contracts in order to allow the

Court to make such a finding.  Moreover, any argument that Mr. Restis is a third-party

beneficiary of the Golden Energy and RX-Drill contracts simply by virtue of his corporate

ownership interests appears misplaced.  *See Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 338

(S.D.N.Y. 2005) (stating that a benefit received through corporate ownership is insufficient to

establish rights as a third-party beneficiary under New York law); *Tradition Chile Agentes de*

*Valores Ltda. v. ICAP Sec. USA LLC*, No. 09 Civ. 10343 (WHP), 2010 WL 4739938, at *10

(S.D.N.Y. Nov. 5, 2010) (granting motion to dismiss parent corporation's tortious interference

with contract claim involving subsidiary's employment agreements because the agreements

evinced no intent to benefit parent corporation); *United Int'l Holdings, Inc. v. Wharf (Holdings)*

32

*Ltd.*, 988 F. Supp. 367, 372 (S.D.N.Y. 1997) (finding that parent corporation was not a third-party beneficiary based on the fact that it received a "direct benefit" from payments made from assets held by its wholly owned subsidiaries).  Accordingly, Plaintiffs' tortious interference with contract claim cannot be sustained.

Secondly, even if Plaintiffs had standing to bring the tortious interference with contract claim, the SAC fails to allege that the contracts in question were breached.[14]  Indeed, the SAC merely alleges that Defendants *intended* to cause a breach of such contracts, not that the contracts were actually breached.  SAC ¶¶ 135, 137, 154.  Plaintiffs further plead that there was a termination of the *agreement in principle* with the Cyprus government.  *Id.* ¶ 138.  The SAC also generally refers to "lost third party contracts."  *Id.* ¶ 155.  Such allegations are insufficient for a tortious interference with contract claim.  *Cf. Skyline Travel, Inc. (NJ) v. Emirates*, No. 09 Civ. 8007 (LTS) (MHD), 2011 WL 1239783, at *5 (S.D.N.Y. Mar. 28, 2011), *aff'd*, 476 F. App'x 480 (2d Cir. 2012) (dismissing tortious interference with contract claim based on plaintiffs' conclusory language regarding actual breach of contract where complaint stated that there were "breaches, interferences . . . [and] total failures of performance of contractual duties" (internal quotation marks and citation omitted)); *Goldin-Feldman Co. v. Blum & Fink, Inc.*, No. 99 Civ. 11637 (VM), 2000 WL 1182798, at *4 (S.D.N.Y. Aug. 18, 2000) (granting motion to dismiss

---

[14] Though Defendants contend that Plaintiffs have pleaded the existence of only potential or theoretical contracts, Defs. Mem. L. 16, the SAC states that there were "valid and existing contracts," including with the underwriters for the Golden Energy IPO and the government of Cyprus.  SAC ¶ 158.  Even though Plaintiffs have also pleaded that *agreements in principle* were in place for Golden Energy and RX-Drill, SAC ¶¶ 134, 137, at this stage of the litigation, Plaintiffs' references to both valid and existing contracts are sufficient to state a tortious interference with contract claim.  *Cf. Linens of Eur., Inc. v. Best Mfg., Inc.*, No. 03 Civ. 9612 (GEL), 2004 WL 2071689, at *20 (S.D.N.Y. Sept. 16, 2004) (dismissing tortious interference with contract claim where plaintiff alleged that it had reached agreements in principle with certain third parties but "conspicuously does not allege the existence of a 'valid contract'" with those third parties (internal citation omitted)).

tortious interference with contract counterclaim because counterclaim plaintiff failed to allege an actual breach of contract).

Defendants' motion to dismiss the tortious interference with contract claim is therefore GRANTED.

### d.  Intentional Infliction of Emotional Distress

Plaintiff Restis alleges that Defendants are liable for intentional infliction of emotional distress as a result of the "name and shame" campaign.  SAC ¶ 164.  Under New York law, the tort of intentional infliction of emotional distress has four elements:  (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.  *See Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996).  "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress."  *Id.*; *see also Gay v. Carlson*, 60 F.3d 83, 89 (2d Cir. 1995) ("We have noted that New York courts have been 'very strict' in applying these elements." (quoting *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985))).  Indeed, as the Second Circuit recognized in *Stuto v. Fleishman*, New York courts have found liability for intentional infliction of emotional distress "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  164 F.3d 820, 827 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (N.Y. 1993) (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (N.Y. 1983))).  The standard is "set deliberately high to ensure that a plaintiff's claim of emotional distress is genuine and to dissuade litigation where only bad manners and hurt feelings are involved."  *Thai v. Cayre Grp.*, 726 F. Supp. 2d 323, 336-37 (S.D.N.Y. 2010).  As courts in

34

this Circuit have recognized, defamatory statements generally cannot constitute the extreme and

outrageous behavior required for an intentional infliction of emotional distress claim. *See, e.g.*,

*House v. Wackenhut Servs., Inc.*, No. 10 Civ. 9476 (CM) (FM), 2011 WL 6326100, at *5

(S.D.N.Y. Dec. 16, 2011) (quoting *Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355, 372

(W.D.N.Y. 2010)); *Ostrowsky v. Dep't of Educ.*, No. 12-CV-2439 (RRM) (JO), 2013 WL

5963137, at *11 (E.D.N.Y. Nov. 7, 2013).

Even if Defendants' actions were sufficiently extreme and outrageous, however,

Plaintiffs' claim for intentional infliction of emotional distress fails for another reason--a claim

for intentional infliction of emotional distress fails where it falls within the ambit of another tort.

*Fordham v. Islip Union Free Sch. Dist.*, 662 F. Supp. 2d 261, 276 (E.D.N.Y. 2009).  Courts in

this Circuit consistently dismiss intentional infliction of emotional distress claims where plaintiff

alleges no facts beyond those necessary to sustain another tort claim.  For example, in *M+J*

*Savitt, Inc. v. Savitt*, No. 08 Civ. 8535 (DLC), 2009 WL 691278, at *14 (S.D.N.Y. Mar. 17,

2009), the court granted defendants' motion to dismiss an intentional infliction of emotional

distress claim in part because the statement on which it was based fell within the ambit of

plaintiff's claim for defamation.  *See also Anyanwu v. Columbia Broad. Sys., Inc.*, 887 F. Supp.

690, 693 (S.D.N.Y. 1995) (granting motion to dismiss intentional infliction of emotional distress

claim because New York courts have held that a separate cause of action "for what are

essentially defamation claims" should not be entertained).  Relatedly, the Second Circuit decided

in *Chao* that *all* New York state tort claims—not just tortious interference—are barred where the

entire injury alleged flows from the effect on the plaintiff's reputation.  476 F. App'x at 895.

Plaintiffs specify that Defendants' "deliberate and malicious 'name and shame' campaign

of false and defamatory statements" caused Mr. Restis severe mental pain.  SAC ¶¶ 165, 166.

Accordingly, Mr. Restis' intentional infliction of emotional distress claim "falls entirely within the ambit" of the defamation claim.  Defendants' motion to dismiss the intentional infliction of emotional distress claim is therefore GRANTED.

### e. *Prima Facie* Tort

Plaintiffs further allege that Defendants' "name and shame" campaign constitutes *prima facie* tort.  *Id.* ¶ 171.[15]  Under New York Law, there are four elements required to support a claim for *prima facie* tort:  (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful.  *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998) (citing *Curiano v. Suozzi*, 480 N.Y.S.2d 466, 469 (N.Y. 1984)).  "The first element requires 'disinterested malevolence,' which means that 'the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm.'"  *Hall*, 185 F. Supp. 2d at 304 (quoting *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990)).  Accordingly, "motives other than disinterested malevolence, 'such as profit, self-interest, or business advantage' will defeat a prima facie tort claim."  *Twin Labs.*, 900 F.2d at 571 (internal citations omitted).  Defendants argue that the *prima facie* tort claim must be dismissed because Plaintiffs contend that Defendants engaged in the "name and shame" campaign out of concern for the public safety.  Defs. Mem. L. 18.  While the SAC alleges that Defendants were "singularly motivated by disinterested malevolence toward Plaintiffs," SAC ¶ 171, the Second Circuit has observed that in *prima facie* tort cases involving acts of expression, "wherever a defendant's

---

[15] The Court notes that *prima facie* tort is a "highly disfavored" cause of action in New York.  *See Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 347 (S.D.N.Y. 2000) (stating that *prima facie* tort is "highly disfavored" in New York and that it is well settled that any claim covered by a traditional tort claim cannot be the basis of a *prima facie* tort, even if the traditional tort claim turns out not to be viable); *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 304 (S.D.N.Y. 2002) (noting that *prima facie* tort is a disfavored claim under New York law).

actions can be seen, at least in part, as having been motivated by the desire to express some

opinion, [this] cause of action . . . will fail." *McKenzie v. Dow Jones & Co., Inc.*, 355 F. App'x

533, 536 (2d Cir. 2009).  However, the Court need not consider whether Defendants' "name and

shame" campaign can be seen as motivated by such a desire because the *prima facie* tort claim

must be dismissed as duplicative.

      As with the other tort claims, the factual allegations underlying the *prima facie* cause of

action relate to the dissemination of allegedly defamatory materials; accordingly this cause of

action must fail.  *Cf. id.* (affirming dismissal of *prima facie* tort claim on Rule 12(b)(6) motion

where the claim "repeatedly avail[ed] itself of the terminology of defamation"); *Chao*, 2010 WL

5222118, at *14 (granting motion to dismiss *prima facie* tort claim because it related "only to

defamatory allegations" and therefore "must fail").  Defendants' motion to dismiss the *prima

facie* tort claim is therefore GRANTED.

### f.  Request to Strike

      Finally, Defendants request that the Court strike all non-actionable statements.  Defs.

Mem. L. 30.  Rule 12(f) of the Federal Rules of Civil Procedure provides that a court may strike

from a pleading any redundant, immaterial, impertinent, or scandalous matter.  Fed. R. Civ. P.

12(f).  Indeed, allegations may be stricken where they have no bearing on the parties' claims or

defenses, will likely be prejudicial, or where they have criminal overtones.  *Aventis Envtl. Sci.

USA LP v. Scotts Co.*, No. 99 Civ. 4015 (LAP) (THK), 2003 WL 1787295, at *2 (S.D.N.Y. Apr.

3, 2003).  "However, 'the courts should not tamper with pleadings unless there is a strong reason

for so doing.'"  *Id.* (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir.

1976)).  "[I]t is settled that the motion [to strike] will be denied, unless it can be shown that no

evidence in support of the allegation would be admissible."  *Lipsky*, 551 F.2d at 893; *see also*

*Ulla-Maija, Inc. v. Kivimaki*, No. 02 Civ. 3640 (AGS), 2003 WL 169777, at *4 (S.D.N.Y. Jan. 23, 2003) (observing that motions to strike are disfavored and will not be granted unless it is clear that the allegations can have no possible bearing on the subject matter of the litigation).

In their reply memorandum, Defendants state that Plaintiffs' pleadings contain "a mass of irrelevant or inflammatory material," including extensive references to offensive Facebook comments, claims of non-parties, and repeated references to FBB.  Defs. Reply Mem. L. 3. However, Defendants have failed to show that these allegations have no bearing on Plaintiffs' claims, or that Plaintiffs would be unable to admit any evidence in support of such allegations at trial.  Accordingly, Defendants have not provided the strong reason required in order for the Court to tamper with the pleadings.  Defendants' request to strike is therefore DENIED.[16]

---

[16] Defendants separately request that the Court strike all allegations of damages purportedly suffered by non-parties to the litigation as immaterial.  Defs. Mem. L. 31-32.  In particular, Defendants seek to strike allegations of damages relating to the Golden Energy IPO and the RX-Drill joint venture.  *See id.*  Plaintiffs contend in response that they seek only the damages they personally suffered as a result of the defamatory campaign targeted against them, which include reputational and monetary damages.  Pls. Opp. Mem. L. 30-31.  Because Plaintiffs have pleaded that they were the targets of the defamatory campaign, and that they suffered damages as a result of the interference with the business transactions in question, the Court will not strike these allegations.

**IV.    Conclusion**

For the reasons set forth above, Defendants' motion to dismiss is GRANTED in part and
DENIED in part.  Specifically, Defendants' motion to dismiss the tortious interference with
prospective economic advantage, tortious interference with contract, intentional infliction of
emotional distress, and *prima facie* tort claims is GRANTED; Defendants' motion to dismiss the
defamation claim is DENIED.  The Clerk of the Court is respectfully directed to terminate the
motion (Doc. 25).


It is SO ORDERED.

Dated:      September 30, 2014
            New York, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.